**COTTER & COMPANY AND SUBSIDIARIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 493–82T.**

United States Claims Court.

Aug. 30, 1984.

George W. Benson, Chicago, Ill., for plaintiff; James L. Malone, III, and McDermott, Will & Emery, Chicago, Ill., of counsel.

Allan C. Lewis, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

REGINALD W. GIBSON, Judge.

This is an income tax refund suit by plaintiff, Cotter & Company and Subsidiaries (Cotter), for its taxable years 1972, 1973, 1975, and 1976[1] in the aggregate

amount of $129,344.96. Jurisdiction in this court is premised on Section 1491, Title 28, United States Code, and Sections 1382–88 and 7422, Title 26, United States Code.

This case emanates from the audit of plaintiff's 1975 and 1976 corporate income tax returns in September, 1981, which determined, *inter alia,* that certain income (*i.e.,* interest income from the investment of excess cash; rental income from the leasing of extra warehouse space; sprinkler income; and gains on sales of property) "is income derived from sources other than patronage" and therefore is not deductible from the gross income of the cooperative (Cotter). Thereafter, claims for refund were filed which were administratively disallowed. Based on the petition filed in this court, plaintiff's refund claim theory avers that defendant improperly recharacterized said income. It also raised alternative contentions for the taxable year 1975, premised on a net operating loss issue for said year as well as net operating loss carryback issues to 1972 and 1973, and a net operating loss carryover to 1976. This court is of the opinion that, premised on the evidence adduced at the trial on the merits, plaintiff is entitled to judgment, but only to the extent of the wrongful assessment of tax on sprinkler income, for the reasons hereinafter delineated.

### FACTS[2]

Plaintiff is a nonexempt[3] cooperative wholesaler of hardware, variety and associated products organized and operating subject to the provisions of subchapter T (sections 1381–1388) of the Internal Revenue Code (I.R.C.) of 1954. It also manufac-

---

**1.** For the years in issue Cotter filed consolidated corporate income tax returns, on the accrual basis, using the calendar year as its taxable accounting period.

**2.** The parties entered into an extensive stipulation as set forth in Joint Exhibits 114A and 114B consisting of paragraphs 1 through 204. The parties also agree to paragraphs 1 through 204 (except as to paragraph 105 *infra*) as requested findings of fact. As to paragraph 105, plaintiff agrees thereto as modified in defendant's proposed finding of fact 284. Additionally, defendant agrees to plaintiff's requested findings of fact in paragraphs 211, 214–219, 222–223, 225–

229, 233, 238, 245 and 247–250. Plaintiff agrees to defendant's requested findings of fact in paragraphs 281–282, 284, and 287. This court, therefore, finds said facts accordingly, as well as those delineated elsewhere in this opinion.

**3.** Under subchapter T of the 1954 Internal Revenue Code, there are two types of cooperatives—exempt and nonexempt. The former classification embraces farmers' cooperatives. (Section 1381(a)(1).) While both are entitled to deduct patronage dividends from gross income, only the *exempt* cooperatives may deduct *non* patronage distributions.

tures certain other related products (*i.e.*, paints, lawn mowers, and small tractors). Cotter's genesis stems from the early 1940's at which time competition from chain stores and other large hardware retailers threatened the very existence of small independently owned hardware stores. This leverage was occasioned by the fact that the large retailers enjoyed substantial economical buying and merchandising advantages which independent hardware stores did not have. In short, the "old-line" hardware wholesalers found it difficult in keeping the smaller hardware retailers competitive in view of the fact that their purchasing practices were in small quantities, and they were unable to take advantage of the economies inuring from purchases of large quantities. Therefore, in July 1948, John M. Cotter led a group of 25 small independent hardware retailers, located in the midwest, which founded plaintiff. As the founder, John M. Cotter lent his name to the organization.

Pursuant to subchapter T of the I.R.C., in order for a retail variety hardware store to be eligible to do business with Cotter and receive "patronage dividends," it must first become a member of the cooperative. Any retail hardware or variety store may become a member of plaintiff upon meeting certain financial eligibility standards, receiving the approval of an officer of plaintiff, signing a membership agreement, and purchasing or subscribing for ten (10) shares of plaintiff's Class A common stock (the only class of voting stock) at a price of $100 per share. However, no person or member may acquire additional amounts of such voting stock, as a consequence of which control of plaintiff is equally divided among its members.

As a cooperative, and pursuant to agreement, plaintiff is obligated to distribute its net earnings from business done with or for its members to such members in the form of patronage dividends. Such earnings are allocated annually based upon business done by each member with plaintiff during the year. The patronage dividend for a year is normally paid in March of the succeeding year after audited financial statements have been prepared. [For example, for the taxable calendar year of 1975 plaintiff reported earnings on its audited financial statements of $30,394,178, which statements were dated February 16, 1976. Plaintiff thereafter paid the patronage dividends for 1975 in the amount of $30,155,908 to its members on March 1, 1976. Thus, premised on its filed income tax return for its 1975 taxable year, plaintiff distributed all of its net earnings from patronage operations to its members for the year and retained only those net earnings which it deemed to be nonpatronage in the total amount of $238,270.]

During the pertinent years herein, except for paints, lawn mowers, and small tractors which were manufactured on its premises, all of the products which plaintiff sold to its members were products which it purchased from independent manufacturers. Sales by plaintiff of purchased products from independent manufacturers which were in turn sold to member stores can be divided into three categories: (a) Warehouse sales, *i.e.*, items purchased in bulk by plaintiff and stored in plaintiff's warehouse facilities that were subsequently resold by Cotter upon receipt of orders from members; (b) direct shipment sales, *i.e.*, purchases by plaintiff, upon receipt by independent manufacturers of orders from members, but delivered direct to members by the manufacturers; and (c) relay sales, *i.e.*, purchases by plaintiff in response to specific requests of members for a product which is not normally held in inventory, which is then promptly broken up and "relayed" in plaintiff's trucks to the members who have placed a relay order. For the taxable year 1975, warehouse sales aggregated 37.8% of total sales, direct shipment sales aggregated 41%, relay sales aggregated 19.6%, and miscellaneous sales to nonmembers aggregated the remaining 1.6%.

*Paint Manufacturing Facilities:*

Plaintiff began manufacturing paint for sale to members under the "Tru-Test" label in 1967 with the acquisition of the paint

manufacturing facilities of General Paint and Varnish Company, Inc. These facilities, located in Chicago, Illinois, consisted of a complex of buildings containing approximately 73,000 square feet of working space. Following the foregoing acquisition in 1967, plaintiff expanded its paint manufacturing operations beginning in 1968, at which time it built a 14,000 square foot addition to the original paint manufacturing plant in Chicago. And, in mid-1971, plaintiff built a 20,000 square foot warehouse addition to the original paint manufacturing plant. Further, in December 1971, plaintiff acquired two properties which were improved by two adjoining three-story buildings located at 823 and 825 West Blackhawk Street, Chicago, Illinois. These properties were located approximately one mile from its original paint manufacturing plant. One of the foregoing properties consisting of 50,000 square feet was converted into additional paint plant manufacturing space in June of 1972, while the other building, consisting of approximately 25,000 square feet was converted for paint production commencing in 1973. Late in 1974, plaintiff acquired by purchase approximately 1.5 acres of land which was adjacent to the original paint manufacturing plant. This property was improved by a two-story building which was used for storage in 1975. And in July 1975 construction was completed on a 600,000 square foot warehouse facility in Allentown, Pennsylvania. While this newly constructed facility was not initially used for paint production, a portion of the facility (approximately 193,000 square feet) was designed to permit manufacture of water base paint in anticipation of future growth of plaintiff's paint business. Additionally, in 1975, a 300,000 square foot manufacturing plant was constructed in Carey, Illinois, and production began at this plant in April of 1976. This facility operated in addition to the plaintiff's paint manufacturing operations located in Chicago, Illinois.

Cotter's paint sales were made exclusively to member stores and its sales increased in 1967 from a low of $430,088 to a high of $24,982,565 in 1975.

*Lawn Mowers:*

In May 1971, plaintiff purchased a small manufacturing plant in Carpentersville, Illinois, and in September of the same year it commenced the manufacturing of lawn mowers for sale to its member stores. Following the foregoing, in August of 1972, plaintiff commenced the manufacturing of small tractors in a lease plant which was located in Shelbyville, Illinois. However, in July of 1973, the tractor manufacturing conducted at Shelbyville was transferred to its Carpentersville plant. Thereafter, in July of 1975, the lawn mower and small tractor manufacturing operations previously conducted at Carpentersville was transferred to a newly constructed manufacturing facility in Carey, Illinois, and the Carpentersville plant was sold for cash in August of 1975. This new Carey facility, consisting of 278,000 square feet and located on 31 acres was acquired in July of 1973.

The lawn mowers and small tractors manufactured by Cotter under the "Lawn Chiefs" label (for 1975 and prior years sold under the "Tru-Test" label) were sold directly to member stores and also to nonmember stores through a wholly-owned subsidiary styled Wheeler Manufacturing, Inc. Sales of such items to nonmember stores were deemed to be economically feasible inasmuch as it enabled Cotter to optimize maximum production at the lowest per unit cost for each manufactured item. From its inception in 1971 the sales of lawn mowers and tractors aggregated from a low of $50,203 to a high in 1975 of $10,467,775.

*Primary Activities Performed by Cotter:*

Plaintiff performed the following principal functions in servicing its members in 1975 in connection with the sales of manufactured and purchased products: (a) purchasing, (b) warehousing products sold other than by direct shipment (warehousing in the case of relay sales was only temporary), and (c) the distribution of inventoried products using transportation equipment which it owns or leases. This service en-

abled its members to compete effectively with chain and discount stores and other hardware and variety retailers. In this connection, Cotter serves its members by purchasing products on the best possible terms through its large volume purchasing power, and then by warehousing and distributing the products to its members at the lowest possible cost for resale to their customers in a manner which meets their needs. These functions achieve significant cost savings, not otherwise available to its members which are ultimately passed through to members in the form of patronage dividends. Moreover, such services also provide member stores with a broader range of quality products than they could otherwise independently obtain.

Through its manufacturing function, on behalf of its members and subsequent sales to members, as well as to nonmembers, Cotter also passes along to members only, any savings from manufacturing, as well as savings resulting from its ability to warehouse and distribute the manufactured products efficiently. The foregoing functions therefore provide plaintiff's member stores with a reliable source of supply of purchased as well as manufactured products.

Because plaintiff's member stores were located throughout the United States, it was imperative that plaintiff maintained adequate warehouse facilities for a broad range of products, purchased as well as manufactured, in various locations close to its member stores to enable it to fill their orders for products quickly and efficiently. In view of the foregoing demands plaintiff maintained (owned) warehouse and manufacturing facilities in nine locations scattered across the United States by 1975 (Illinois, Texas, California, Missouri, Georgia, New Hampshire, Oregon, Ohio, and Pennsylvania) consisting of 3,246,000 square feet in the aggregate, and also leased approximately 360,000 square feet of additional warehouse space in one other location in Kentucky. Of the 3,246,000 square feet of warehouse space which Cotter owned as of December 31, 1975, it leased directly to third persons 78,654 square feet thereof, or approximately 2.4% of the total owned warehouse space.

For the ten year period 1965–1975, inclusively, plaintiff experienced phenomenal growth in membership from approximately 1,800 members in 1965 to 5,100 members in 1975 and in sales of $87.8 million in 1965 to sales of $569.7 million in 1975. To a substantial extent plaintiff's growth is also attributable to several acquisitions over the years prior to 1975. This precipitous growth required plaintiff to continuously increase its warehousing capacity, either by construction or by acquisition, in order to meet the expanding demands of its member stores. In forecasting its needs with respect to warehouse space, plaintiff's planning and economic strategies argued strongly for the proposition that it should build with an eye on the inevitable necessity of needing *additional* space within a reasonably short period of time. As a consequence, plaintiff's new construction factored in excess capacity which perceptibly absorbed its immediate and foreseeable growth requirements.

In conjunction with providing its member stores with a full line of hardware products, at the lowest possible cost, plaintiff also provided its members with related business services, for example, use of the True-Value or V & S Variety trademarks; store identification signs; assisting member stores in advertising its products; and assistance in store planning, inventory control, accounting, fixture financing, insurance, and credit card activities.

In providing the foregoing activities to its member stores, plaintiff employed several employees in staff administrative positions whose responsibilities consisted primarily of accounting and administrative functions, including, but not limited to, assurance that it is able to meet its continuing cash flow requirements. As of December 31, 1975, Cotter employed approximately 2.097 persons, more than 50% of whom were employed in warehouse functions.

In June 1975, plaintiff established a finance department consisting of eight em-

ployees. Through said department, plaintiff has sought to manage its financial affairs conservatively, so as to be certain that it would always have sufficient funds to purchase supplies at favorable terms for its members. The department has also attempted, through its conservative financial management policies, to maintain sufficient lines of credit to meet plaintiff's short-term credit needs. Thus, because plaintiff is engaged in a "seasonal" business, in which it must make the bulk of its purchases in certain seasons, the department considered it necessary to periodically retain substantial amounts of cash on hand. Much of the excess cash retained was invested by the finance department in short-term certificates of deposit and commercial paper which generated interest income.

*Interest Income:*

On its 1975 federal income tax return, plaintiff reported gross interest income in the aggregate amount of $679,373, including but not limited to income from the following sources:

| | | |
|---|---|---|
| i. | Commercial paper and certificates of deposit | $363,321.70 |
| ii. | Portland installment note | 12,361.45 |
| iii. | Seattle installment note | 5,122.98 |
| | | $380,806.13 |

Plaintiff apparently deducted all of the $679,373 from its gross income as "patronage dividends" distributed to its members, pursuant to I.R.C. § 1382(b). In the audit report pertaining to the taxable year 1975 dated September 17, 1981, defendant contended that the foregoing three categories of interest income are not properly deductible as patronage dividends inasmuch as they were earned from business other than business done with or for patrons.[4] After an adjustment of $1,991.32, to account for an inadvertent understatement of plaintiff's income from commercial paper and

certificates of deposit, the correct amount of gross interest income recharacterized by defendant as nonpatronage dividends, and in issue, aggregates $382,797.45, consisting of the following:

| | | |
|---|---|---|
| i. | Commercial paper and certificates of deposit | $365,313.02 |
| ii. | Portland installment sale interest | 12,361.45 |
| iii. | Seattle installment sale interest | 5,122.98 |
| | TOTAL | $382,797.45 |

*Rental Income:*

The audit report for 1975 also reclassified $127,625 of gross rental income from deductible patronage dividends to nondeductible nonpatronage sourced income. The *amount* of such rental income *in issue* is stipulated as follows:

| Source of Rental Income | Amount of Gross Rent |
|---|---|
| i. Cabinet Shoppe-West Lake | $ 6,503.00 |
| ii. Western Auto-Portland | 73,362.00 |
| iii. National Car-Dallas | 30,000.00 |
| iv. Blackhawk-Paint Division | 5,157.00 |
| v. Gotham/A&M-Sprinkler Income | 4,233.00 |
| vi. Miscellaneous [5] | 8,370.00 |
| TOTAL | $127,625.00 |

The foregoing income, as to items i–iv, was generated by plaintiff leasing excess warehouse space that existed during the taxable year 1975, which was either purchased or constructed by the plaintiff.

*Gain On The Sale Of A Facility, Machinery And Equipment, And Other Assets:*

On its 1975 return Cotter also reported several sales transactions consisting of certain land and buildings, as well as machinery and equipment used in its business, and deducted the gains therefrom ($253,970) as patronage sourced dividends. On audit, the Service recharacterized said transactions in computing income available for patronage dividends, thereby disallowing the $253,970 as a patronage dividend deduc-

---

**4.** Defendant actually contended in its audit that an additional $19,158 in interest income from certificates of deposit should also have been included as nondeductible interest income, initially placing a total amount of $399,964.00 in dispute. The parties now stipulate, however, that the investigating revenue agent erroneously counted said amount of $19,158 twice in his calculation of plaintiff's interest income.

**5.** Plaintiff has not specified the source(s) of its miscellaneous rental income in the amount of $8,370.00 (item vi) at any point in the instant proceedings. Thus, we can only conclude that plaintiff abandons this item.

tion. Although plaintiff initially challenged the legality of said recharacterization in the present litigation, it failed to substantiate its challenge in its pretrial submissions or at trial, and then expressly abandoned this challenge at trial.[6]

In calculating the net adjustment from recharacterized nonpatronage sourced income, the agent allowed Cotter certain related expenses against the recharacterized interest and rental income. The following table summarizes said recharacterized income, related expenses allowed by the agent, and the net audit adjustment(s) initially in issue:

| Item | Gross Income | I.R.S. Allowed General and Admin. Expenses | I.R.S. Allowed Related Expenses | Net |
|---|---|---|---|---|
| 1. Interest income | $399,964 | $27,500 | | $372,464 |
| 2. Rental income | $127,625 | | $33,652 | $ 93,973 |
| 3. Gain on sales of property | $253,970 | | | $253,970 |
| TOTAL | $781,559 | $27,500 | $33,652 | $720,407 |

The $720,407, *supra*, therefore represents the Service's reduction in the amount of the patronage dividend deduction previously claimed by Cotter. However, in addition to the adjustments reducing the patronage dividend deduction, *supra*, there were other adjustments in the patronage dividend deduction, not in issue here, which increased the plaintiff's deductions. These adjustments, when factored against the $720,407, resulted in a net reduction in Cotter's patronage dividend deduction claimed, per return, in a net aggregate amount of $341,948.[7]

On March 1, 1982, in view of the foregoing, plaintiff filed with the District Director of the Internal Revenue Service claims for refund of taxes for the taxable years 1972, 1973, 1975, and 1976 in the aggregate amount of $129,344.96.[8]

(a) said recharacterized income (interest, rental, and gains on sale of property used in the business) is in fact patronage sourced income;

(b) alternatively, plaintiff incurred related expenses "in an amount equal to at least $720,407 which defendant ... erroneously failed to allocate to such gross income." Notwithstanding the foregoing, on its Form 1120X, *i.e.,* claim for refund, plaintiff asserted an adjustment of only $330,618 ($341,948—$11,330 charitable contribution adjustment), not considered by the agent, which resulted in a net operating loss in 1975 of *$116,340* ($214,278—$330,618);

(c) consequently, the total refund claimed by plaintiff was arrived at as follows:

6. Colloquy between the court and counsel for the defendant at the end of the trial:

"Q. Are you saying that Plaintiff abandoned the capital gains issue?

A. Yes, sir, your Honor." (Tr. 498).

7. With the foregoing, other nonpatronage adjustments resulted in a net audit adjustment to taxable income of a *negative* figure of ($64,888). In other words, reported taxable income of Cotter for 1975 aggregated $279,166 and with the net overall audit adjustment of ($64,888), the net corrected taxable income determined for the 1975 audit is $214,278.

8. These claims for refund were based on the following premises as alleged in the petition:

Form 1120X NOL–1975:                       ($116,340)

Carryback Loss from 1975:

(i) 1972 – taxable income $89,982

## DISCUSSION

Subchapter T of the Internal Revenue Code entitles plaintiff, as a nonexempt cooperative, to deduct amounts paid to its patrons that qualify as "patronage dividends." I.R.C. § 1382(b). The sole issue in this case is whether the following three categories of income so qualify:[9]

(A) Interest income, derived from the investment of surplus cash in short-term commercial paper and certificates of deposit;

(B) Rental income, derived from the leasing of excess warehouse space; and

(C) Rental income derived from the usage by contiguous firms of the sprinkler system at plaintiff's Chicago warehouse facility.

The statutory definition of the term "patronage dividend" is contained in I.R.C. § 1388(a), and provides, inter alia, that only those amounts paid to patrons by a qualified cooperative "on the basis of quantity or value of business done *with or for* [its] patron[s]" qualify under this designation. (Emphasis added.) Moreover, said statute specifically excludes "any amount paid to a patron to the extent that ... such amount is out of earnings *other than* from business done *with* or *for* patrons." (Emphasis added.)

Respecting the issues at bar, plaintiff therefore contends, as it must in order to prevail under the foregoing statute, that each of the foregoing categories of income was derived from business done *with* or *for* its patrons. With respect to the interest income, plaintiff avers that *all* of the *activities* of its Finance Department, *supra*, including those which produced such interest income, constituted business done "for" the sole benefit of its patrons. At trial, plaintiff introduced considerable evidence seeking to demonstrate that the seasonal fluctuations inherent in its business necessitated the retention of large amounts of cash on hand during certain parts of each year. Plaintiff also attempted to show that if such large cash balances were not readily available, such circumstance could jeopardize its reputation for prompt payment of its bills which it had painstakingly built over nearly three decades. This reputation was said to be, in turn, a foundation for the favorable terms plaintiff received from suppliers and banks, the economic benefits of which inured to its patrons. Premised on the foregoing, plaintiff argues that the interest income received from the investment of its temporary surplus cash, which corpus represented in part the proceeds from these "integral" activities of its Finance Department, was in fact income derived from business done *"for"* patrons.

With respect to the rental income issue, plaintiff contends that its patrons' long-term economic interests were best served by the purchase or construction of ware-

| | |
|---|---|
| (ii) 1973 – taxable income $26,358 | |
| 1975 NOL absorbed in 1972 and 1973 | $116,340 |
| | --0-- |
| **Tax Refund Claimed** | |
| (i) 1972 | $ 8,962 |
| (ii) 1973 | 59,024 |
| (iii) 1976 Claim for refund premised on 1975 allowable contribution carryover to 1976 (tax $5,262 + interest $1,792.64) | 7,054 |
| (iv) 1975 Claimed Refund (NOL $116,340) | 47,568 |
| Interest | 6,736 |
| Total Refund Claimed (1972, 1973, 1975, 1976) | $129,344. |

9. In its complaint, plaintiff also proffered another claim, in the alternative, to the effect that if the court does not permit plaintiff to deduct the income in question, *supra*, as patronage dividends, it should nevertheless permit plaintiff to offset against this income the related expenses incurred in generating such income. Whereas defendant challenged this claim on the ground that plaintiff did not timely raise it before the IRS at the administrative stage, and was thus barred by 26 U.S.C. § 7422 and the regulations thereunder, plaintiff unequivocally abandoned said claim in its post-trial brief. *See also Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138 (1983), and cases cited therein.

houses with sufficient space to facilitate short-term growth in inventory, which had almost continuously taken place since the founding of the cooperative. It therefore maintains that the leasing of such temporary excess warehouse space that existed in particular years was an integral part of the purchasing, marketing, and service activities of the cooperative. Plaintiff further contends that the fees it received from other nearby firms for the use of its sprinkler system in its Chicago facility were also patronage sourced income, because the furnishing of water which produced such fees was conducted largely as a self-defense measure to protect its own warehouse in case of fire and insured that its own system functioned properly.

Conversely, defendant contends in substance, with respect to the interest income, that it was not necessary for plaintiff to keep large amounts of cash or liquid assets, and that plaintiff could have retained its reputation with suppliers and banks while lowering its net cash surplus if it had paid its dividends or long-term debts at an earlier time. Moreover, defendant argues that the earning of income from excess cash was not income obtained "with or for patrons," as defined by applicable regulations, and therefore it was not entitled to be deducted as a patronage dividend. Defendant also contends that the leasing of excess warehouse space and the receipt of fees for the use of plaintiff's sprinkler system constituted "incidental" income that is not properly classifiable as patronage sourced.

Our analysis of these issues begins with the obvious observation that if Congress had intended the term "with or for patrons" to be unlimited in scope, *all* income produced by cooperatives that is passed through to patrons would be, in essence, income obtained *for* patrons, and would,

therefore, be considered patronage sourced. Both the legislative history of subchapter T and the regulations applicable thereto clearly show, however, that Congress had no such intention.

First, it is apparent from the Senate Committee Report accompanying the forerunner of subchapter T, contained in the Revenue Act of 1951, that Congress intended to tax "ordinary" (*i.e.*, non-farmer) cooperatives for "nonoperating income ... not derived from patronage, as for example in the case of interest or rental income, ..." even if such income was distributed to patrons on a pro rata basis.[10] S.Rep. No. 781, 82d Cong., 1st Sess. (1951), *reprinted in* [1951] U.S.Code Cong. & Adm.News 1969, 1989. This directive of Congress was apparently implemented in the following regulatory definition, first promulgated in 1951, which provides inferential guidance as to the meaning of "patronage [sourced] dividend":

> (c) *Deduction for amounts allocated from income not derived from patronage—*
>
> (2) *Definition.* As used in this paragraph, the term "income derived from sources other than patronage" means *incidental income derived from sources not directly related to the marketing, purchasing, or service activities* of the cooperative association. For example, income derived from the lease of premises, from investment in securities, or from the sale or exchange of capital assets, constitutes income derived from sources other than patronage. (Emphasis added.)

Treas.Reg. § 1.382–3(c)(2). In *St. Louis Bank for Cooperatives v. United States,* 224 Ct.Cl. 289, 297, 624 F.2d 1041 (1980), our predecessor court noted that—"The [foregoing] IRS description of nonpatronage sourced income is a long-standing in-

---

**10.** Section 314 of the Revenue Act of 1951, followed by subchapter T in 1962, formalized and then clarified the difference in treatment between farmers' cooperatives and non-farmers' cooperatives that had previously been recognized only at the administrative and judicial level. *See Farmers Cooperative Co. v. Birming-* ham, 86 F.Supp. 201, 219, 222 (D.Iowa 1949). Aside from the above-quoted language from the 1951 Senate Committee Report, Congress has provided no express guidance with respect to which third-party sources of income should qualify as patronage sources.

terpretation and the statutory provisions to which the regulations pertain twice have been reenacted by Congress without material change." The court indicated, therefore, that the teaching of this regulation may be accorded great weight, because it was deemed to have Congressional approval. *Id.*

Hence, the test that this court must apply is not whether the income in question accrues to the benefit of the patrons, but rather, it is whether said income is *"incidental income* derived from sources *not directly related* to the *marketing, purchasing, or service activities* of the cooperative association." In amplifying the meaning of "incidental income ... not directly related ...," the court in *St. Louis Bank* adopted the following IRS interpretation, first delineated in Rev.Rul. 69–576, 1969–2 C.B. 166:

> The classification of an item of income as from either patronage or nonpatronage sources is dependent on the relationship of the activity generating the income to the marketing, purchasing, or service activities of the cooperative. If the income is produced by *a transaction which actually facilitates the accomplishment of the cooperatives' marketing, purchasing, or service activities,* the income is from patronage sources. *However, if the transaction producing the income does not actually facilitate the accomplishment of these activities but merely enhances the overall profitability of the cooperative,* being merely incidental to the association's cooperative operation, the income is from nonpatronage sources.

(Emphasis added.) *See also* Rev.Rul. 74–160, 1974–2 C.B. 245; *Twin County Gro-*

cers, *Inc. v. United States,* 2 Cl.Ct. 657, 661 (1983). Pursuant to the foregoing, Judge Spector of the Claims Court noted that the sharp focus of the court's inquiry, in determining whether income is patronage sourced, should be on whether the *"transactions* [which produced the income] facilitate the *basic* functions of the cooperative in some way *other* than simple money management or overall profitability." *Twin County Grocers,* 2 Cl.Ct. at 662 (emphasis added). Against these legal standards we now apply the operative facts respecting the issues.

A. *Interest Income:*

As was noted, *supra,* plaintiff contends that the *activity* which ultimately produced its interest income, *i.e.,* all of the operations of its Finance Department, qualifies said income as patronage sourced under the foregoing rule, because such operations facilitated and were directly related to the cooperative's basic functions.[11] Plaintiff, therefore, is requesting, in effect, that this court give said rule a heretofore unprecedented construction, under which *all* income realized from the activities of a department of a cooperative would qualify as patronage sourced, even if the specific *transaction(s)* which produced this income may not have actually or directly facilitated the cooperative's basic functions. Such a construction, in this court's view, is extremely over broad, particularly in view of the fact that the word "activity" is susceptible to a looser interpretation than "transaction," and is clearly inconsistent with the foregoing "transaction" test cited by the predecessor court with approval, *supra.*

Hence, in disposing of this issue, *St. Louis Bank* teaches that this court must

---

**11.** According to the stipulation of the parties, plaintiff's "principal function is to provide its members with quality hardware, variety, and related products at the lowest possible cost for sale to their customers." This point was reaffirmed in the testimony of plaintiff's president, Mr. Daniel Cotter, who stated that when plaintiff's salesmen promoted the cooperative to prospective members, they emphasized the advantages which could inure to them in the form of lower prices and an increased selection of quali-

ty merchandise. Although plaintiff contends in its post-trial brief that part of its "cooperative purpose" was "providing its members with various related [financial] business services," this court believes that the evidence more clearly supports another statement made by plaintiff—that its financial activities are "supportive activities" which are "subordinate and reactive to manufacturing, buying, warehousing and distribution activities."

determine only whether the "transaction(s)" which generated the interest income in issue facilitated the basic purchasing, marketing, or service activities of plaintiff. Simply put, such transactions involved the short-term investment of seasonal surplus cash, *not* the activities of plaintiff's Finance Department viewed as a whole. Although plaintiff persuasively established by various elaborate charts and graphs that the *retention* of liquidity during certain parts of the year was an important contributing factor to its successful operation as a cooperative, it did not concomitantly demonstrate at least to this court's satisfaction that the income derived from the *investment* of surplus cash "actually facilitate[d]" its basic purchasing, marketing or service activities. In fact, this court finds the probative evidence adduced respecting such a direct connection to be conspicuously wanting.

Indeed, notwithstanding the extensive showing made by plaintiff relative to the importance of retaining excess cash, it downplayed the bearing of the results of the investment of such cash in facilitating any of its basic functions. For example, although plaintiff claimed that its overall financing activities enabled it to raise necessary capital, it never contended that the investment of surplus cash provided it with capital, nor did it argue that such investment provided access to significant sources of capital. To the contrary, plaintiff's own finance manager, Mr. David Moorshead, testified that:

> Our goal is not to lend money. Our goal is to make sure that we have assets available when they are required, and that the company is liquid. Our desire is not to make interest income.

[Mr. Moorshead then reaffirmed the foregoing assertion on cross-examination when he stated:

> The point [of investing plaintiff's excess cash] is not to generate income. We weren't trying to generate income. That was exactly it. It was a drop in the bucket .... The object was not to earn interest, it was to manage the finances of the firm correctly and in so doing we earned interest.]

The apparent relative unimportance to plaintiff's basic functions, *supra*, of the investment of surplus cash is further underscored by the nonexistence of any written document which evidences a commitment by plaintiff to provide financial management services on behalf of its patrons. Another indication of the insignificance or the incidental nature of plaintiff's investment activities in its overall financial operations comes from the testimony of Mr. Ben Nelson, executive vice president of plaintiff's principal bank. Mr. Nelson stated that although he would seriously question the competence of a customer, such as plaintiff, if it did not earn income from its excess cash retained in the bank, such inaction would not endanger the customer's line of credit. When the foregoing is combined with the miniscule amount of interest income generated by plaintiff (less than 1/10 of 1% of plaintiff's annual sales), it becomes clear that the transactions which produced the interest income played no significant role in facilitating the basic functional activities of plaintiff.

The deficiencies in plaintiff's position with respect to the interest income are apparent from a review of the cases relied upon by plaintiff. In this connection, plaintiff relies primarily on *St. Louis Bank*, *supra*, because that decision held interest income from the investment of a cooperative's surplus funds to be patronage sourced, despite the fact that said investment was made in the form of loans to nonmembers. We observe, as a threshold observation, that the facts in *St. Louis Bank* are fundamentally distinguishable from those of the instant case. In *St. Louis Bank*, the cooperative in question was a *financial service* cooperative, providing a "banking service [for] the provision of a ready source of funds for long-term or seasonal loans for its members." 224 Ct.Cl. at 304, 624 F.2d 1041. "Management of both surplus funds and funds to cover a deficit position was an integral part of plaintiff's activities as a banking service

cooperative." *Id.* Moreover, as the court found in *St. Louis Bank:*

> In the management of surplus funds, plaintiff secures interest income which results in lessening costs for the credit provided for its patrons.... *The transactions which generated interest income* from the use of surplus funds are *integrally intertwined* with the process of borrowing money to supply capital to the cooperatives.... [and thus are] directly related to plaintiff's services to its members. (Emphasis added.)

*Id.* at 308, 624 F.2d 1041. As was seen, *supra,* no such integral relationship has been established here between the transactions which produced interest income and plaintiff's basic and primary cooperative functions.

Similarly, *Land O'Lakes, Inc. v. United States,* 675 F.2d 988, 993 (8th Cir.1982), provides plaintiff no comfort. In *Land O'Lakes,* the taxpayer cooperative paid dividends to its patrons from stock it owned in a bank for cooperatives. The transactions which produced these dividends (*i.e.,* the purchase of stock in the cooperative bank by plaintiff) were required before the taxpayer could obtain financing from the bank, however. Thus, the court held that "because [said] *transaction* facilitated the cooperative's activities by providing financing on terms favorable to the cooperative, the income from the bank stock ... was properly deductible as a patronage dividend." *Id.* (Emphasis added.)

The case at bar appears to be considerably closer, factually, to *Twin County Grocers, supra,* than either of the foregoing cases. In *Twin County Grocers,* plaintiff, a retail food distribution cooperative, received interest income on investments of its cash surpluses in short-term certificates of deposit. Such investments, like those here, "were made in the belief that this was the most prudent manner of utilizing any cash surpluses, pending a need for their use in the cooperative's business." 2 Cl.Ct. at 658. The taxpayer contended there that such investments were "service" activities that tended to reduce the amount that it

needed to borrow when it was in a deficit cash position. Nevertheless, the court found that there was "little if any evidence that money management constituted even a small part of the basic services which [the taxpayer] rendered." *Id.* at 661. Consequently, it held that said investments constituted only "a prudent (but incidental) method of enhancing overall profitability, not unlike other investments it could have made." *Id.* at 662.

Plaintiff maintains that the holding in *Twin County Grocers* should not be adopted here because the brief stipulation of facts on which that decision was apparently based did not establish any connection between the activities which produced interest income and accomplishment of the purpose of the cooperative. For reasons discussed, *supra,* however, applicable law requires that the cooperative establish a connection between the *transaction* that produced the income and the *basic* services it rendered. No sufficient predicate has been laid in either *Twin County Grocers* or the instant case for finding that the *investment* of the surplus cash retained, *ipso facto,* facilitated the cooperative's basic purchasing, marketing, or service activities. Hence, this court chooses to follow *Twin County Grocers,* since the facts of *St. Louis Bank, supra,* are inapposite, and hold that the interest income at issue was not derived from patronage and thus is not deductible from plaintiff's gross income inasmuch as it "merely enhances the overall profitability of the cooperative, [thus] being merely incidental to the association's cooperative operation ...."

### B. *Rental Income—Warehouse Space:*

■ As is the case for the interest income, *supra,* the dispositive question with respect to rental income is whether the transaction which produced such income, *i.e.,* the rental of excess warehouse space, facilitated the basic purchasing and marketing activities of plaintiff. In challenging the determination of the Commissioner of Internal Revenue that its rental income was not patronage sourced, plaintiff has

the heavy burden to demonstrate that said determination was in error in view of the presumptive correctness of the Commissioner's determination. *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976). Here again, the showing made by plaintiff with respect to the transactions at issue falls far short of satisfying that burden.

■ Plaintiff here was able to show that the purchase or construction of warehouse facilities larger than necessary for its present needs facilitated the operation of its growing business. It made a thoroughly insufficient showing, however, that the *rental* of excess space contributed in any significant way to the accomplishment of its principal functions, aside from enhancing the cooperative's overall profitability.[12] Additionally, plaintiff makes the bald assertion that "For a cooperative to have nonpatronage rental income, it must be in the business of renting facilities, unrelated to its business and which it has no intention of using in its business, to third parties." Plaintiff has proffered no authority to support this assertion, and this court is unaware of any such supportive authority. To the contrary, "income derived from the lease of premises" as a general example of "nonpatronage sourced income" in the applicable regulation, *supra*, undercuts the validity of plaintiff's argument. Because plaintiff has totally failed to show why the foregoing example should not apply to it, we also hold that the income derived from rental of excess warehouse space was not patronage sourced.

C. *Sprinkler System Income:*

■ The uncontroverted evidence relating to the use of plaintiff's sprinkler system by neighboring business(es) presents a significantly different picture than for interest and other rental income. The par-

ties' stipulation, as well as the testimony of Mr. Cotter, indicates that when plaintiff's Chicago warehouse facilities were purchased, they were serviced by a "loop" sprinkler system, to which certain nearby buildings owned by unrelated parties were connected. Starting in 1959, when plaintiff acquired the property on which the water tanks and pumping equipment for the system were located, it entered into contracts with the owners of all other buildings on the "loop" to supply water for the system. The water was provided as an "accommodation" to plaintiff's neighbors for a total fee of $4,233 in 1975, which was "nominal" in plaintiff's view, and designed only to recoup a portion of the maintenance expense of the system.[13] A major reason why plaintiff supplied its neighbors with water from the system was so as to facilitate the protection of its own warehouses in the event of a fire which might occur in adjacent buildings. Moreover, plaintiff had a strong interest in maintaining its neighbors' portions of the sprinkler system because defects there could have impaired the effectiveness of plaintiff's own system.

In light of the foregoing facts, it is readily apparent that the transaction which produced income from plaintiff's sprinkler system, *i.e.*, the provision of water and maintenance to its neighbors in exchange for a usage fee, was implemented largely for the protection of its warehouse facilities and inventory against damage or destruction by fire. Against this background, therefore, said transaction unquestionably facilitated the accomplishment of plaintiff's basic purchasing, marketing, and distribution services, and cannot be said to have merely enhanced the overall profitability of the cooperative. Accordingly, distributions to patrons of income received from plaintiff's

---

**12.** It is significant to note that plaintiff does not contend that it would not have been able to economically purchase or construct its warehouse facilities if it had not rented out the excess space contained therein. Indeed, if such an assertion °had been made, it would be rendered questionable, at the very least, by plain-

tiff's assertion that only 2.4% of plaintiff's usable space was rented to outside parties in 1975.

**13.** Supportive thereof is the fact that the installation of one shut-off valve alone in 1976 cost $6,087.50, the equivalent of almost 1½ years of rental income for the entire system.

sprinkler system must be held to be "patronage dividends."

#### D. *Charitable Contribution Deduction:*

 On audit, based on corrected taxable income of $225,608 (without the charitable deduction), the Service allowed plaintiff a charitable contribution deduction of $11,330.[14] Inasmuch as this opinion overturns the Service's determination only with respect to the recharacterization of sprinkler income ($4,233), taxable income is decreased by said amount which is deemed to be patronage sourced. Since corporate charitable deductions are limited to a maximum of 5% of taxable income, the decrease in taxable income, *supra,* necessarily requires an adjustment in the deductible charitable contribution as follows:

| | |
|---|---:|
| Taxable Income Per Audit (for charitable limitation) | $225,608 |
| Decrease—Sprinkler Income | (4,233) |
| Adjusted Taxable Income | $221,375 |
| 5% of $221,375—Maximum Allowable | $ 11,069 |
| Charitable Contribution Allowed Per Audit | $ 11,330 |
| Corrected Charitable Deduction | $ 11,069 |
| Decrease in Allowable Charitable Contribution | $ 261 |

*Summary of Adjustments to Taxable Income:*

| | | |
|---|---|---:|
| (i) | Sprinkler Income—Patronage Sourced | $ 4,233 |
| (ii) | Decrease in Charitable Deduction | (261) |
| | Adjustment to Taxable Income—Net | $ 3,972 |

#### CONCLUSION

In view of the foregoing, the Clerk shall enter judgment in favor of plaintiff consistent with this opinion upon the receipt of a joint stipulation from the parties as to the precise amount of the tax refund applicable to the net reduction in taxable income, *supra.*

Such stipulation shall be filed with this court within 20 days of the date of this opinion.

IT IS SO ORDERED.

---

**14.** Maximum allowed deduction under § 170, I.R.C., for the 1975 taxable year is 5% of taxable income without the reduction for charitable deduction. Per audit the Service allowed therefore as a charitable deduction $11,330. This appears to be in error inasmuch as 5% of $225,608 is $11,280 (*i.e.,* $50 error).