NICHOLS, Senior Circuit Judge.
 

 The question presented on appeal is whether interest income from commercial paper and certificates of deposits (CDs) and income accruing from the rental of warehouse space are earnings from business done “with or for” patrons of a cooperative, under 26 U.S.C. § 1388, when the functions of the cooperative are the manufacture, distribution, and purchase of hardware and related goods in volume for its members. In this tax refund suit, the Claims Court held that the transactions were not business done for patrons, and the income generated could not be considered “patronage dividends” unrealized by the cooperative. On taxpayer’s appeal, in which it receives support from the National Grocers Association as amicus curiae, we reverse as a matter of law on the ground that the court improperly read
 
 St. Louis Bank for Cooperatives v. United States,
 
 624 F.2d 1041, 224 Ct.Cl. 289 (1980), and the intent of Congress.
 

 I
 

 Appellant-taxpayer Cotter and Company and Subsidiaries (Cotter) is a nonexempt cooperative operating pursuant to Subchap-ter T (26 U.S.C. §§ 1381-1388) of the Internal Revenue Code (Code) of 1954, as amended. On its 1975 federal income tax return, Cotter reported gross interest income including income from commercial paper and CDs. This income and certain gross rental income were characterized by taxpayer as “patronage dividends” distributed to its members, and as such were deducted from Cotter’s gross income. The Commissioner of Internal Revenue (Corn-
 
 *1104
 
 missioner) reclassified this income as being nondeductible, nonpatronage sourced. After allowing certain related expenses against this recharacterized income and following other adjustments not relevant to this appeal, the Commissioner reduced Cotter’s patronage dividend deduction by $341,948. Subsequently, taxpayer filed claims for refund of taxes for the taxable years 1972, 1973, 1975, and 1976 in the aggregate amount of $129,344.96. After the Commissioner denied these claims, taxpayer brought suit in the Claims Court, which held against it.
 

 II
 

 The facts relevant to this appeal, the majority of which were stipulated and none of which are in dispute, are set forth in detail in the opinion of the Claims Court,
 
 Cotter & Company and Subsidiaries v. United States,
 
 6 Cl.Ct. 219 (1984), and are only briefly recounted here. Cotter was formed by small independent hardware retailers to gain the benefit of economical buying and merchandising through large volume transactions, comparable to those possible for chain retailers. Organized under Subchapter T, Cotter is obligated to distribute its net earnings from business done with or for its members as patronage dividends. Taxpayer acts for its patrons, in large part, by purchasing goods from independent manufacturers, warehousing their products, and distributing products using transportation owned or leased by Cotter. To a lesser extent Cotter itself manufactures products for its patrons. Cotter serves its members by purchasing goods at the lowest prices available through large volume purchasing, and warehousing and distributing the goods at the lowest possible cost.
 

 Because members are located throughout the United States and need orders filled quickly and efficiently, Cotter must maintain adequate warehouse facilities in many locations for a broad range of products. Having had phenomenal membership growth from 1965 to 1975, Cotter conti-nously needed to increase its warehouse capacity by construction or acquisition. In forecasting its future needs, Cotter determined that it was economically necessary to factor in excess capacity, soon to be absorbed by immediate and foreseeable growth, in planning new warehouse facilities. The rental income at issue here resulted from Cotter’s leasing temporarily excess space to tenants.
 

 In June 1975, Cotter established a finance department through which it sought to manage its financial affairs conservatively, so it would always have sufficient funds available to purchase goods on favorable terms. Similarly, the department attempted to maintain sufficient lines of credit. Cotter engages in a “seasonal” business in which it makes the bulk of its purchases in certain seasons, often many months before it resells its goods to its members. Because Cotter’s payments to manufacturers often are due before it receives funds from its members, it was necessary at times to retain substantial sums of cash on hand. Generally, during part of the year Cotter has a working capital deficit which requires taxpayer to borrow on a short-term basis from banks; at other times Cotter has working capital which is temporarily not needed. While taxpayer could use this money to reduce its long-term debt, “the
 
 retention
 
 of liquidity during certain parts of the year was an important contributing factor to the successful operation as a cooperative * *
 
 Cotter,
 
 6 Cl.Ct. at 229.
 

 When Cotter has capital temporarily excess to its needs, it tries to reduce the cost of capital used in the business by paying down any short-term loans, prepaying bills if advantageous, and finally reducing the overall cost of its funds, these costs being associated with its long-term debt, by buying short-term commercial paper. It would be inconsistent for Cotter to pay down long-term debt with these temporarily unneeded funds, although placing the funds in short-term instruments frequently does not produce as much interest as would be saved if Cotter’s debt could be reduced directly, because of the seasonal nature of
 
 *1105
 
 Cotter’s business, its fluctuating capital needs, and the inflexibility of sources of capital to Cotter, a private company. The interest income considered in this appeal was generated by Cotter’s purchase of commercial paper and CDs, with maturity dates of 43 days or less, using temporarily unneeded funds which, for the above-stated reasons, had to remain accessible to taxpayer. We may take judicial notice that anyone managing temporarily surplus funds for others is expected to realize on the fruits available in the form of interest, and not to do so would be a dereliction of duty, and as will appear, the record includes testimony to the same effect.
 

 Ill
 

 Section 1382 of the Code exempts “patronage dividends,” and § 1388 of the Code states in pertinent part that a patronage dividend “does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from
 
 business done with or for patrons
 
 * * By § 1385 patrons report patronage dividends as income so Treasury needs are not ignored. The Claims Court considered a series of revenue rulings and cases in this and other courts construing § 1388, and concluded that the income produced was nonpa-tronage sourced, based upon a narrow analytical focus limiting the scope of the income-generating “transactions” and an inquiry regarding the need for the income itself. The court viewed its function as determining
 

 only whether the “transaction(s)” which generated the * * * income facilitated the basic purchasing, marketing, or service activities of plaintiff. Simply put, such transactions involved the short-term investment of seasonal surplus cash,
 
 not
 
 the activities of plaintiff’s Finance Department viewed as a whole. Although plaintiff persuasively establishes * * * that the
 
 retention
 
 of liquidity during certain parts of the year was an important contributing factor to its successful operation,
 
 it did not concomitantly demonstrate
 
 * * *
 
 that the income derived from the investment of surplus cash “actually facilitate[dj”
 
 its basic purchasing, marketing, or services activities.
 

 Cotter,
 
 6 Cl.Ct. at 229. [Emphasis supplied.]
 

 The effect of this view is that a penalty is imposed upon Cotter and its patrons for doing what, under existing economic conditions, they have to do. Distributions to patrons are taxed only once except that, when the cooperative does what it must do, parts of the distributions are taxed twice. We cannot believe Congress intended such a result, despite the ambiguous legislative history the Claims Court cites, 6 Cl.Ct. at 227, and which we have considered. We conclude, however, that the Claims Court misapplied the analysis set forth in
 
 St. Louis Bank,
 
 and therefore the judgment must be reversed, although the opinion is well reasoned and, were the court writing on a clean slate, it might be difficult to refute.
 

 This court looks, in the first instance, to our predecessor’s opinion in
 
 St. Louis Bank.
 
 In that case the Court of Claims considered the nature of income produced by the investment of surplus funds, those funds being the product of borrowed money generated during the process of providing services to the cooperative’s patrons. Plaintiff, a banking cooperative authorized to make loans to eligible farmers’ cooperatives, occasionally found itself in an undesired surplus funds position; on an average, however, plaintiff was in a deficit position, borrowing substantially more funds on a short-term basis than it placed out. When in a surplus position, plaintiff would lend its excess funds to other related cooperatives; on occasion repurchase arrangements with brokerage houses were made. The income at issue was earned from these loans.
 

 There, as in
 
 Cotter,
 
 the Commissioner argued that taxpayer’s treatment of its surplus funds was functionally separate from its borrowing to correct a deficit position. Thus, while taxpayer’s borrowing was service-related, according to the Com
 
 *1106
 
 missioner, use of its surplus was a merely incidental attempt to make profits that did not directly facilitate taxpayer’s services. The Court of Claims disagreed.
 

 The Court of Claims had the benefit of the Service’s revenue rulings and Treasury Regulation § 1.1382-3(c)(2), as we do, and distilled from these sources the standard to be applied in this case as in that. The inquiry concerns the direct relationship of the income-generating activities to the cooperative function. Rev.Rul. 69-576, 1969-2 C.B. 166, provides the basic distinction between patronage and nonpatronage activity:
 

 The classification of an item of income as from either patronage or nonpatro-nage sources is dependent on the relationship of the activity generating the income to the * * * activities of the cooperative. If the income is produced by
 
 a transaction which actually facilitates
 
 the accomplishment of the cooperative’s marketing, purchasing, or service activities, the income is from patronage sources. However, if
 
 the transaction
 
 * * *
 
 merely enhances the overall profitability
 
 of the cooperative, being merely incidental to the * * * cooperative operation, the income is from nonpatronage sources.
 

 [Emphasis supplied.]
 

 This “directly related” test has been followed in subsequent revenue rulings.
 
 See
 
 Rev.Rul. 74-160,1974-1 C.B. 246; Rev.Rul. 75-228, 1975-1 C.B. 278.
 
 See also St. Louis Bank,
 
 624 F.2d at 1051 (discussing the defective nature of Rev.Rul. 73-497, 1973-2 C.B. 314, which did not apply the “directly related” test).
 

 In
 
 St. Louis Bank
 
 the Court of Claims applied the “directly related” test by considering the immediate transaction at issue
 
 in light of its relationship to other activities undertaken.
 
 Considered controlling was the relationship of the surplus funds to the funds borrowed by the plaintiff. “In its management
 
 of
 
 surplus funds, [taxpayer] secures interest income which results in lessening costs for the credit provided to its patrons. [Taxpayer’s] demand loans * * * directly reduced the cost of the dollars which already had been borrowed *
 
 St. Louis Bank,
 
 624 F.2d at 1052. The court determined that the “integrally intertwined” relationship of the use of surplus funds and the borrowed money was determinative. “The transactions would not occur but for the process whereby plaintiff secures funds to lend to its members.”
 
 Id. See also id.
 
 at 1053 (holding that income earned from ownership of bonds was patronage sourced as necessary to maintain the required liquidity for doing business at all). Any income generated in this way is considered the result of business done “for patrons.”
 

 While the nature of the income-generating transactions in
 
 St. Louis Bank
 
 and
 
 Cotter
 
 are remarkably similar, the Claims Court found
 
 St. Louis Bank
 
 distinguishable and therefore not controlling. The distinction held determinative was the nature of the cooperative: St. Louis Bank was a banking cooperative, while Cotter is a purchasing and distributing cooperative. Given this distinction, the Claims Court determined it should characterize Cotter’s activity merely as the investment of capital in commercial paper and the rental of space, and thus narrowly focused only on one facet of intertwined transactions. Viewed in this way, the end product of the transaction is the accrual of only limited income, unnecessary to Cotter’s purposes, and merely enhancing overall profitability.
 

 We conclude, however, that our predecessor’s method of analysis, focusing on the totality of the circumstances to determine relatedness, applies with equal vig- or to Cotter’s activities;
 
 St. Louis Bank
 
 cannot be so narrowly read as to limit its application only to banking cooperatives. Allowing the Claims Court’s narrow focus, which considers the transaction without regard to the totality of the circumstances, would allow the surgical removal of one of a series of transactions from the economic realities that necessitated it. Consideration of the relatedness of a transaction to a cooperative’s function must be undertaken by viewing the business environment to
 
 *1107
 
 which it is arguably related.
 
 Accord Mississippi Valley Portland Cement Co. v. United States,
 
 408 F.2d 827, 832 (5th Cir.),
 
 cert. denied,
 
 395 U.S. 844, 89 S.Ct. 2015, 24 L.Ed.2d 462 (1969) (considering the economic realities of transactions in concluding them nonpatronage sourced). The activity producing the income may not be so narrowly defined as to limit it only to its income-generating characteristic
 
 when such a characterization is not consistent with the actual activity.
 

 We are aided further by the Eighth Circuit’s decision in
 
 Land O’Lakes, Inc. v. United States,
 
 675 F.2d 988 (8th Cir.1982). There, taxpayer was required to purchase stock from its bank in order to borrow funds for cooperative purposes. The government argued that dividends from this stock, paid to patrons, were not patronage dividends because the cooperative could have borrowed elsewhere without earning income and the payment to the cooperative was not dependent on the amount of the loan. In rejecting the government’s argument, which separated the income-generating transaction from the actual business activity as a whole, the court held the income was patronage sourced because it was tied to patronage business. The fact that less favorable loans not interwined with income-generating components were available, did not skew the focus towards only the income-producing activity.
 
 See also Linnton Plywood Association v. United States,
 
 410 F.Supp. 1100 (D.Or.1976);
 
 Twin County Grocers, Inc. v. United States,
 
 2 Cl.Ct. 657 (1983) (rejecting a “use” of income test).
 

 IV
 

 Considering the case presented in light of the proper focus, we conclude that the income at issue was earned from business done for patrons. We address first the interest income.
 

 The facts clearly establish that taxpayer must retain large amounts of capital, must retain liquidity, and must borrow money in order to function as a cooperative involved in a seasonal business. Since the
 
 St. Louis Bank
 
 decision in 1980, the roller coaster ride of interest rates has, if possible, taught added appreciation of the enormity of managing property for others (in this case, the patrons) and not realizing such interest as is possible, consistent with safety, on temporarily idle and surplus funds. With such inflation as there may be, high or low, comes a constant shrinkage in the real worth of funds
 
 not
 
 managed in this way. The scheme established by the facts is as follows: taxpayer fulfills its primary function of providing goods at low cost by buying in volume, often before it resells to members. Taxpayer needs large amounts of capital to engage in this large volume merchandizing, and turns to funding by banks. At some point in its seasonal cycle, taxpayer has a temporary surplus of funds. To the extent possible, Cotter uses these funds to pay off debts in a manner consistent with its cooperative purpose; where it can prepay for goods and receive a discount, and thus lower the cost of goods to its customers, it does; where it can reduce its indebtedness without sacrificing its necessary retention of liquidity, it does. Finally, funds exist which must be held to allow Cotter to take advantage of any new purchasing arrangements that will arise in the oncoming months and to assure that it can 'seasonally retire its bank debt. (Cotter, as a seasonal business, is expected to pay up its bank borrowings within 30 to 90 days.) Cotter, acting as any reasonable business person, reduces the cost of this money while retaining its necessary availability by keeping short-term commercial paper. Its actions are akin to placing its funds in a bank account. Cotter's activity, viewed in the context of its business activity, cannot be considered an action enhancing overall profitability; merely to enhance profitability Cotter would pay off its debt or take other more profitable action. Rather, Cotter acts to retain its liquidity in a manner of any reasonable business person. Its actions are similar to those undertaken by taxpayer in
 
 St. Louis Bank.
 

 The government ultimately argues that although retention of these funds is neces
 
 *1108
 
 sary, any activity which incidentally generates income is outside patronage business because such activity, even if the only conservative, reasonable business course available to Cotter, is not “necessary.” At argument the government placed great emphasis on the testimony of Cotter’s banker, in which he stated that he would not necessarily refuse to lend Cotter funds if it did nothing with the large amounts of capital it needed to retain. This testimony, according to the government, sets Cotter’s case apart from
 
 Land O’Lakes.
 

 The government’s characterization of the testimony, while accurate, does not face up to the witness’ plainly stated opinions. On direct examination, Mr. Nelson, the banker, made several points:
 

 Q. How do you relate financial flexibility to the issue of the liquidity?
 

 A. * * * Liquidity has an enormous impact upon whether they can retire their debt on a seasonal basis * * *. Liquidity is a function that not only permits the annual pay off, but permits the company to finance that kind of growth without impacting [on] * * * membership confidence, bank confidence, and supplier confidence.
 

 Q. Could a company like Cotter go along without a [financial] plan and just rely on its banks?
 

 A. No.
 

 Q. What would you do as a banker if you perceived that happening to one of your customers?
 

 A. I would force a plan.
 

 Q. How can you force a plan?
 

 A. Not lend them money.
 

 Q. What, if you were going to force a plan, what would some of the elements of this plan be?
 

 A. Certainly I would want to have * * * an understanding as to how they intended historically as well as in the future to pay back their obligations.
 

 I would want to be assured that they were taking those steps within the current structure to make my institution comfortable that we had sufficient protection.
 

 I would want to be sure that they understood what was happening with them from a growth and volume standpoint so that they had thought out how they were going to finance that aspect of their business.
 

 I would want to have an understanding of the unique capital structure that they had to make sure they didn’t have a distribution action at a most inappropriate time.
 

 Q. And does [the fact that] Cotter has the excess cash, does that enable you to sleep easier at night * * *—
 

 A. Absolutely. You know, it is hard to fully understand sleeping and not sleeping at night until you had a significantly bad credit for which you are responsible for. And it would be foolish of me to suggest that if you have bad credit, that they come from humongous traumatic events.
 

 They come from very simple things like proper management of a company. And the reason why I would sleep well is that they recognized what they were, they were a seasonal company that significantly borrowed from their banks during this seasonal high and managed their affairs so that they could pay out their loans.
 

 >|e $ sjs >¡c ♦ *
 

 Q. [And if a company had no] excess cash, would that give you any discomfort from a seasonal concept?
 

 A. Yes, it would tell me that the odds were very great, more than great, perhaps even absolute that there would come in the near term, a locked-in loan position for that company, so that I would be looking at a seasonal low when I should be paid out, and I’m still in the company’s indebtedness. And if the company is growing, that locked-in position would grow over the year. And some time predictably, one or two things would happen: We would have to recognize that we were a stockholder with none of the benefits, or we would have to
 
 *1109
 
 suggest that the company, that they find other means of financing or in the least possible extreme, would be to for the institution, to tell the person who handles the account to find other employment. But if it is not there, it would cause concern, very extreme concern.
 

 Q. This case, the disallowance in this case is a result from interest income on the excess cash position. If Cotter and Company had not sought to earn any interest income on that excess cash position, what would that have told you as a banker?
 

 A. I think we would feel delighted for a very, very brief period of time. And then I guess I would pick up the phone and call Dan or John and say that David had lost his mind and they should think about another treasurer, because nobody does that. We would like to think that people like us a lot, but nobody likes us that much.
 

 That is a total—would have been a total error and inappropriate action in the financial responsibility of the individual that handles the current assets, current structure.
 

 On cross-examination, Nelson continued:
 

 Q. Assuming that Cotter performed in 1975 as it did and as it had in the past, but that it refused to invest its excess cash in short term commercial paper, would Harris Trust have terminated its line of credit?
 

 A. No. As I said earlier, if that was the case, I would be—feel very, very happy for a little while. I would call up Dan and suggest that he investigate the situation and look at [the manager’s] personal habits or something.
 

 I can, individual events, you know, a variety can add up to concern and add up to greater loss to the company. But to suggest that because I woke up one day and found out that Cotter and Company had unbelievably $30 million in cash in a depository relationship that I would say, get your line and get the hell out of here. I would say, probably sit there and think about it so that I could then—I would call Dan, you know, and say, hey, what is going on, something is happening here. Somebody’s got a wire that has gotten kind of twisted. * * *
 

 Taken in context, Nelson’s comments indicate that as a prudent banker he would not immediately act against a good customer for what was, one might hope, only temporary insanity, but would use his position to correct the financial mismanagement. Taken in context, Cotter’s activity, if not “necessary” to retain its line of credit, was necessary to maintain its business credibility, and it does not require a hyperactive imagination to suppose what the patrons would think too if they learned of the cooperative’s negligent management of their funds. The fact that other, somewhat incredible, alternatives were available, does not necessitate that Cotter act unreasonably to fall within the beneficial scope of Subchapter T.
 

 The rental income earned through the leasing out of temporarily excess space is also patronage sourced. The stipulated facts clearly show that renting temporarily excess space was only a minor component of taxpayer’s plan for making certain that Cotter had sufficient warehouse and manufacturing space. Architects do not as yet provide warehouses with accordion pleated walls that may be expanded or contracted in strict conformity to the owner’s needs. Indeed, the Claims Court concluded that “the purchase or construction of warehouse facilities larger than necessary for its present needs facilitated the operation of its growing business.”
 
 Cotter,
 
 6 Cl.Ct. at 231. The court then erred by considering the short-term rental of temporarily unneeded space apart from the facts that Cotter had to maintain excess space, the determination of required capacity is inexact, and the space was rented only as part of Cotter’s plan to expand its space over its then-existing needs. It is clear from the undisputed facts that Cotter did not go into the warehouse rental business, seeking to enhance corporate profits while hiding behind its label as a cooperative. Indeed, Cotter occasionally must lease space from
 
 *1110
 
 others as well. Rather, Cotter implemented a reasonable plan to secure the warehousing of its goods at the lowest cost to its patrons; the result is a primary function of Cotter’s.
 

 Conclusion
 

 We agree with the Claims Court that Congress did not intend the term “with or for patrons” to be “of unlimited scope, [so that]
 
 all
 
 income produced by cooperatives that is passed through to patrons would be, in essence, income obtained
 
 for
 
 patrons, and would, therefore, be considered patronage sourced.”
 
 Cotter,
 
 6 Cl.Ct. at 227. A cooperative cannot merely “clothe its shareholders as patrons and its corporate dividends as patronage payments” and retain the benefits of Subchapter T.
 
 Mississippi Valley,
 
 408 F.2d at 835. But Subchapter T was also not enacted to require that a cooperative acting for its patrons function in an economically unreasonable manner or penalize it for acting reasonably. Considering the income-generating transaction in its relation to all the activity undertaken to fulfill a cooperative function will allow courts to distinguish from cooperative activity transactions which merely enhance overall profitability in a manner incidental to cooperative function. Such activity is not to receive the benefits of Subchapter T, but other activity, which does directly relate to cooperative function when considered in its actual business environment, cannot properly be considered outside “business done with or for patrons.” Cotter’s transactions here were not merely to gain incidental profits; they resulted from activities integrally intertwined with the cooperative’s functions. The earnings Cotter in this case produced and passed through to its members are patronage dividends.
 

 Therefore, the judgment of the Claims Court is reversed. The cause is remanded to the Claims Court for determination of the quantum of recovery.
 

 REVERSED AND REMANDED.