**MISSISSIPPI VALLEY PORTLAND CE-MENT COMPANY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 25618.**

United States Court of Appeals Fifth Circuit.

March 14, 1969.

Certiorari Denied June 9, 1969.

See 89 S.Ct. 2015.

Vardaman S. Dunn, Jackson, Miss., for appellant; Cox, Dunn & Clark, Jackson, Miss., of counsel.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Harry Marselli, Karl Schmeidler, Howard M. Koff, Attys., Dept. of Justice, Washington, D. C., Robert E. Hauberg, U. S. Atty., Jackson,

828

Miss., for appellee; Joseph E. Brown, Jr., Asst. U. S. Atty., of counsel.

Before GOLDBERG and AINSWORTH, Circuit Judges, and SPEARS, District Judge.

GOLDBERG, Circuit Judge:

The taxpayer, a nontax-exempt cooperative incorporated in Mississippi, sought to deduct distributions to its shareholders from its corporate income tax as "patronage dividends." [1] These payments were made from the corporation's net profits during the tax years in question. The district court, 280 F. Supp. 393, agreeing with the Commissioner, said that notwithstanding the cooperative camouflage, these payments were in reality no more than dividends

paid to the corporation's shareholders, and held that they were not deductible as patronage dividends.[2] We, like the district court, cannot sanction a masquerade wherein a dividend is costumed in the habiliments of a patronage dividend. The judgment of the court below is affirmed.

I.

The relevant facts have been stipulated by the parties and may be summarized as follows:

The Mississippi Valley Portland Cement Company, the taxpayer, was incorporated in the State of Mississippi in 1956. Initially it issued 500,000 shares of stock, of which approximately 417,000 shares were issued to eight individuals,

---

1. See generally Clark and Warlich, Taxation of Cooperatives: A Problem Solved, 47 Minn.L.Rev. 997 (1963); Comment, Taxation of Cooperatives Under 1962 Revenue Act, 41 Tex.L.Rev. 908 (1963); cf. Logan, Federal Income Taxation of Farmers' and Other Cooperatives, 44 Tex.L.Rev. 250 (1965).

2. Internal Revenue Code of 1954:
SEC. 1381. ORGANIZATIONS TO WHICH PART APPLIES.
(a) In General—This part shall apply to—

(1) any organization exempt from tax under section 521 (relating to exemption of farmers' cooperatives from tax), and

(2) any corporation operating on a cooperative basis other than an organization—
(A) which is exempt from tax under this chapter,
(B) which is subject to the provisions of —
(i) part II of subchapter H (relating to mutual savings banks, etc.), or
(ii) subchapter L (relating to insurance companies), or
(C) which is engaged in furnishing electric energy, or providing telephone service, to persons in rural areas.
(26 U.S.C.A. § 1381)
SEC. 1382. TAXABLE INCOME OF COOPERATIVES.
(a) Gross Income—Except as provided in sub-section (b), the gross income of

any organization to which this part applies shall be determined without any adjustment (as a reduction in gross receipts, an increase in cost of goods sold, or otherwise) by reason of any allocation or distribution to a patron out of the net earnings of such organization.

(b) Patronage Dividends.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d)) with respect to patronage occurring during such taxable year; or

(2) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid as a patronage dividend during the payment period for the taxable year during which the patronage occurred. * * * For purposes of this title, any amount not taken into account under the preceding sentence shall be treated in the same manner as an item of gross income and as a deduction therefrom.
* * * * *
(26 U.S.C.A. § 1382).

and the balance to their friends, relatives, and employees.[3] In 1957 it issued an additional 1,400,000 shares which it sold to the general public in four southern states, with approximately ninety percent being sold in Mississippi.

The taxpayer was organized as a cooperative under Mississippi law to manufacture and sell cement. Its charter, as amended, provided that the record owner of every five shares of stock had a preferred patronage right to purchase one barrel of cement during each fiscal year.[4] The stockholders and their assigns would have to buy the cement at the prevailing market price; but, to the extent that the sales price exceeded the cost of production and sale, patronage refunds would be paid to the stockholders annually in proportion to the amount of cement allocated to them or to their assignees.

Pursuant to authority conferred upon it by the corporate charter, the taxpayer's board of directors adopted resolutions in January of each relevant year, prior to the February 1 beginning of the taxpayer's fiscal year, allocating the plant's entire production of cement to the stockholder-patrons or their assigns on the basis of their stock ownership. These board resolutions also provided that any profit margins from the production of cement should belong to the stockholder-patrons of record at the end of each fiscal year, and that they would be refunded as a patronage rebate, either in cash or reserve certificates. The taxpayer's obligation to produce cement and to allocate it to the shareholders was to be enforceable as a contract.

The resolutions additionally provided that sales of cement would be made to or for the account of Valley Cement Sales, Inc.[5] Valley Sales is a separate nontax-exempt cooperative corporation organized by several of Mississippi Valley Portland Cement Company's officers, directors, and stockholders as a sales

3. The principal owners of the stock originally issued by the taxpayer were as follows:

| Name | Shares | Occupation |
|---|---|---|
| R. W. Hyde | 69,798 | Pres., Construction Co. |
| Cecil F. Travis | 46,993 | Attorney |
| James W. Sanders | 46,993 | Pres., Textile Co. |
| A. N. Morgan * | 83,911–1/3 | Accountant |
| Kent B. Diehl | 50,005 | Consulting Engineer |
| David W. Adams | 42,855 | Public Relations Counsel |
| Calvin Huffman | 66,230 | Businessman; Promoter |
| James Fowler | 10,000 | Pres., Automobile Agency |
| Total | 416,785–1/3 | |

* Held in various trusts for benefit of Mr. Morgan's minor children and wife.

———◆———

4. In the period of its corporate existence during which stock was being sold, the taxpayer filed registration statements with the Securities and Exchange Commission and with corresponding agencies of the State of Mississippi and several surrounding states. The prospectus, as included in the registration statements, stated that every stockholder had a patronage right to purchase cement in proportion to the amount of stock held and that such patronage rights were assignable.

5. The resolution adopted at the board meeting on January 17, 1962, provides in part as follows:

"7. Sales of cement will be made to or for the account of Valley Cement Sales, Inc., a Corporation organized as a sales agency for the benefit of stockholder-patrons who assign to it their patronage rights, at the market price to consumers less a quantity discount to be negotiated between the two Companies and the Company will rebate to Valley Cement Sales, Inc. in accordance with the total patronage rights of its assignors as covered in said assignments.

"8. Any cement produced and not taken by stockholders or their assignee by the 30th day of the month following

agency for the stockholder-patrons. The taxpayer subsequently entered into contracts with Valley Sales whereby it assigned to the latter all patronage rights to cement produced by the taxpayer during the forthcoming fiscal year and not purchased by the stockholder-patrons or others. During the relevant year, all of the cement produced by the taxpayer was delivered to Valley Sales to be sold to the general public.

At the conclusion of each tax year, the net receipts from sales of cement over and above production costs were allocated and distributed by the taxpayer to its stockholders of record in proportion to each person's stock ownership as of the year's end. It was not shown that the taxpayer had any stockholders other than those designated by it as stockholder-patrons, or that it did any business except on behalf of its stockholder patrons.

In its income tax returns for its fiscal years ending January 31, 1962, 1963, and 1964, the taxpayer excluded the following amounts from its gross income as patronage dividends either allocated or paid to its stockholder-patrons:

| Year ended | Margin allocated or paid to stockholder-patrons |
|---|---|
| 1–31–62 | $ 285,215.14 |
| 1–31–63 | 454,208.41 |
| 1–31–64 | 421,296.68 |
| | 1,160,720.23 |

As a result of these exclusions, the taxpayer reported no taxable income for these years. The Commissioner, in reviewing the taxpayer's return, determined that the distributions to shareholders did not qualify as patronage payments, and therefore that the taxpayer owed a total tax of $505,561.97 for the three years in question.

The taxpayer paid the assessment and then sued in the district court for a refund of that amount. In holding that

the Commissioner's assessment was correct and that the taxpayer was not entitled to a refund, the district court wrote as follows:

"There is nothing in the method of doing business by the taxpayer in this case that distinguishes it from the average or normal corporation doing business for profit, no matter that the taxpayer is called a cooperative, or that the dividends to stockholders are referred to as patronage rebates. Other characteristics of this taxpayer akin to that of a corporation for profit is that the dividends were payable only to stockholders of record at the end of each fiscal year, leaving stockholders, who might have sold their shares prior thereto, with no entitlement to a rebate on the basis of earnings during the fiscal year; and the fact that, as stipulated, actually no stockholder used the cement produced. All allocations were assigned to a sales agency or sold by that agency. As further stipulated, any allocations and delivery of cement to a patron were discouraged.

"It is the opinion of this Court, after carefully scrutinizing the structure of this taxpayer and its method of doing business, that it was not doing business with its consumer patrons or assigns in the historical sense of a consumer cooperative, but that its stockholders are in no different category from that of any corporation interested in profits, no matter whether the source of that profit be from the production of cement or any other product, and that accordingly the sums paid here are not excludable from taxable income."

II.

The sole question presented by this appeal is whether the district court erred in holding that the taxpayer's distribution of its net profits in the years

production may be sold on the open market by Mississippi Valley Portland Cement Company for the account of its stockholder-patrons, as their interests

may appear, or the Company may deliver such unclaimed cement to Valley Cement Sales, Inc. on the terms aforesaid."

in question could not be categorized as patronage dividends.[6] To answer this question we look first to the statutory definition of a "patronage dividend." Section 1388(a), as added by the Revenue Act of 1962, provides:

"(a) *Patronage Dividend.*—For purposes of this subchapter, the term 'patronage dividend' means an amount paid to a patron by an organization to which part I of this subchapter applies—

(1) on the basis of quantity or value of business done with or for such patron.

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) *such amount is out of earnings other than from business done with or for patrons,* or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions." [Emphasis added.] [26 U.S.C.A. § 1388].[7]

6. We agree with the taxpayer's argument that a patronage dividend is an item which is "excluded" rather than "deducted" from the taxpayer's gross income. This distinction, while peripheral to the merits of this case, is not unimportant. A taxpayer has a far more difficult burden in trying to prove that he is entitled to a deduction, which is allowed as a matter of legislative grace, than he does in showing that a distribution is not income. See Davis v. United States, 2 Cir. 1937, 87 F.2d 323, cert. denied, 301 U.S. 704, 57 S.Ct. 937, 81 L.Ed. 1359. We find that both the cases and a literal reading of the Code to support the taxpayer's contention that patronage payments are properly termed "exclusions." In Farmers Cooperative Co. v. Birmingham, N.D. Iowa, 1949, 86 F. Supp. 201, 217, we read:

"Some confusion apparently exists as to whether a patronage dividend is properly termed a 'deduction' or an 'exclusion' from cooperative gross income. It is in fact considered by the Treasury Department as an exclusion from gross income. G.C.M. 17895, C.B. 1937–1, 56; I.T. 3208, C.B. 1938–2, 127. It is believed that the use of the term 'exclusion' instead of 'deduction' makes for clarity. See Bradley, Taxation of Cooperatives, Harvard Business Review 576, 577 (Autumn, 1947)."

See also United States v. Mississippi Chemical Co., 5 Cir. 1964, 326 F.2d 569, 574–575; cf. Pomeroy Cooperative Grain Co. v. Commissioner of Internal Revenue, 8 Cir. 1961, 288 F.2d 326.

Section 1382 of the Code, enacted in 1962, generally incorporates prior case law regarding patronage payments and in particular incorporates the judicial labeling of such distributions as exclusions. Section 1382 in relevant part provides that "the gross income of any organization to which this part applies shall be determined without any adjustment * * * by reason of any allocation or distribution to a patron out of the net earnings of such organization." The intent to treat these payments as exclusions could not be clearer if Congress had used the word "exclusion." We therefore approach the question sub judice in full recognition of the burden of proof arising out of the exclusionary nature of patronage dividends.

7. Sections 1381 et seq. did not become operative until December 31, 1962. Thus, technically speaking, § 1388 is applicable only to the last of the three tax years involved in this appeal. With respect to the definition of a patronage distribution, however, sections 1381 et seq. are merely a codification of prior case law. See 1962 U.S. Code Cong. and Adm.News, p. 3414 ff; cf. Pomeroy Cooperative Grain Company v. Commissioner of Internal Revenue, 8 Cir. 1961, 288 F.2d 326 (discussion of prerequisites to excludability of patronage payments); Farmers Cooperative Co. v. Birmingham, N.D. Iowa 1949, 86 F.Supp. 201 (discussion of prerequisites to excludability of patronage payments and history thereof). Our construction of § 1381 will, therefore, be made in the light of the preexisting case law; and our result, although discussed in statutory terms, should be considered as based on pre-section 1388 case law in-

■ Of particular importance to the disposition of this case is the language requiring that the distribution be made out of earnings from "business done with or for patrons." The Commissioner would have us construe the words "with or for" to mean that the patrons must physically handle the products of the cooperative. The taxpayer, on the other hand, argues that neither the statute nor the cases have imposed such a physical contact requirement. We note that in most bona fide cooperative arrangements the patron does in some manner actually touch the subject matter of the transactions. For example, a marketing cooperative usually sells to the general public commodities or products of the patron, and a purchasing cooperative usually purchases items to be used or consumed by the patron. *cf*. American Box Shook Export Ass'n v. Commissioner of Internal Revenue, 9 Cir. 1946, 156 F.2d 629; Farmers Cooperative Co. v. Birmingham, N.D.Iowa 1949, 86 F. Supp 201, 210–217. Extending the syllogism, a manufacturing cooperative should usually, but not always, consume or otherwise physically use the product of the cooperative. *cf*. Fruit Growers' Supply Co. v. Commissioner of Internal Revenue, 9 Cir. 1932, 56 F.2d 90. Thus, evidence that the patron actually used the product points logically to the conclusion that the business was conducted "with or for" such patron. Conversely, the absence of such evidence would support, but not compel, a conclusion to the contrary.

Since the absence of patron contact with the cement is not decisive, we must delve more deeply into the record. All of the cement produced by the taxpayer was allocated to the shareholder-patrons at the beginning of each fiscal year by a resolution of the board of directors. These resolutions gave the shareholder-patrons the option of either physically taking the cement or, by inaction, allowing their share to be assigned to a sales agency which would sell the cement to the general public in their behalf. In practice, instances of shareholder-patrons actually taking cement from the plant were almost non-existent and virtually all of the cement was assigned to the sales agency. Counsel for the taxpayer explained this circumstance by saying that the patrons had to be discouraged from picking up cement at the plant because their small orders were too disruptive of plant operations.

Thus, generally speaking, the stockholder-patrons never had any actual use for or contact with the product of their corporation. The closest they came to the cement was to receive a right to X-number of barrels of cement which was semi-automatically assigned to a sales agency.[8] Pointing to this circumstance, the Commissioner contends that the stockholder-patrons used the cement only for the purpose of gaining a return on their investment in the corporation and that such returned earnings are in economic substance no different from the dividends paid by a typical corporation to its shareholders. He argues that

---

sofar as the first two tax years are concerned. In short, the statutory and the preexisting judicial expositions of the necessary elements of a patronage dividend are identical, and the result in this case would be the same under either.

8. In the record we find the following stipulations:

"11. Approximately 90% of the stock of Mississippi Valley Portland Cement Company was represented by executed assignments to Valley Cement Sales in 1960, when the company began production of cement. All stockholders re-

ceived the same pro-rata distributions whether assignments were executed or not, at times pertinent to this suit.

"12. In the years ended January 31, 1962–1964, inclusive, the entire amount of production had by Mississippi Valley Portland Cement Company was, in accordance with properly executed assignments on the part of its stockholder-patrons, or in accordance with the provisions of the Charter and resolutions of its Board of Directors as aforesaid, delivered by Mississippi Valley Portland Cement Company to Valley Cement Sales, Inc."

the allocations and assignments of cement were merely paper transactions devoid of economic substance and that their only function was to enable the taxpayer to pass its net profits on to its shareholders without such profits ever being included in the corporation's gross income under § 61 of the Code.[9]

The thrust of the Commissioner's argument is that this Court should characterize these transactions as sham transactions, and should hold that the tax-payer's profits were really earned from sales of cement to the general public. The result of such a holding would be that the corporation's profits would not be from business done "with or for" its patrons, and therefore that such dividends would not be excludable from its corporate income as patronage dividends.[10]  See Rev.Rul. 57–59.

■■  We have lifted the cooperative veil and have unmasked the economic realities of these transactions.[11] Our con-

9. § 61. Gross income defined [26 U.S. C.A. § 61]
    (a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
        (1) Compensation for services, including fees, commissions, and similar items;
        (2) Gross income derived from business;
        (3) Gains derived from dealings in property;
        (4) Interest;
        (5) Rents;
        (6) Royalties;
        (7) Dividends;
        (8) Alimony and separate maintenance payments;
        (9) Annuities;
        (10) Income from life insurance and endowment contracts;
        (11) Pensions;
        (12) Income from discharge of indebtedness;
        (13) Distributive share of partnership gross income;
        (14) Income in respect of a decedent; and
        (15) Income from an interest in an estate or trust.

10. In the legislative history of the Revenue Act of 1962 we find the following commentary on the meaning of "business done with or for patrons":
    "It is made clear that there are not to be included as patronage dividends any amounts which are out of earnings other than from business done with or for patrons, or any amounts paid to patrons which are attributable to the patronage of other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions. Thus, if a cooperative does not pay any patronage dividends to nonmembers, any portion of the amounts paid to members which is out of net earnings from patronage with nonmembers, and which would have been paid to the nonmembers if all patrons were treated alike, is not a patronage dividend." 1962–3 Cum.Bull. 707–721; 1962–2 U.S. Code Cong. and Adm.News, p. 3620.

11. It is well established that "our income tax law is premised on fact and not fiction." Blackstone Realty Co. v. Commissioner of Internal Revenue, 5 Cir. 1968, 398 F.2d 991, 996. While a taxpayer is free to arrange his business with an intent to avoid or minimize taxes, his transactions are to be analyzed for their pragmatic realities. Id. As we stated in Redwing Carriers, Inc. v. Tomlinson, 5 Cir. 1968, 399 F.2d 652, 657, "both the Supreme Court and our Court have on numerous occasions stated that when the realities of a transaction differ from its paper shell, the Internal Revenue Service and the courts may open the shell and look inside to determine the substance of the transaction." In Higgins v. Smith, 1940, 308 U.S. 473, 60 S. Ct. 355, 358, 84 L.Ed. 406, 411, the Supreme Court wrote:
    "A taxpayer is free to adopt such organization for his affairs as he may choose and having elected to do some business as a corporation, he must accept the tax disadvantages.
    "On the other hand, the Government may not be required to acquiesce in the taxpayer's election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is

clusion is that the taxpayer's shareholders were no more than paper patrons, and "that the distribution to stockholders was nothing more than a dividend paid out of profits of the corporation." Peoples Gin Co., Inc. v. Commissioner of Internal Revenue, 5 Cir. 1941, 118 F.2d 72, 73. The corporate conspectus and prospectus show that the taxpayer's business was selling cement to the general public. Its shareholders were merely investors and non-essential links in a conduit to the outside, not consumers of the corporate product. The distributions to these shareholders, therefore, represented profits from corporate dealings with the general public and should be taxed accordingly. See Smith & Wiggins Gin, Inc. v. Commissioner of Internal Revenue, 5 Cir. 1965, 341 F.2d 341, 347–351.

Although our finding that the taxpayer's shareholders were pseudo-patrons is based upon an examination of the record as a whole, we find two factors in this case to be particularly elucidative of the true nature of the distributions. First, the resolutions adopted by the taxpayer's board of directors, which is quoted in part in footnote 5, *supra,* shows the corporate intent and potential for open market operations. By providing for pre-packaged semi-automatic assignments of the taxpayer's entire production, these corporate documents showed that the corporate purpose was not to supply its shareholders with cement at a reduced cost but to supply them with a return on their invested capital. Although they contained words which allocated the cement in kind, the resolutions had the practical effect of both channeling the cement to its ultimate consumers and declaring a dividend on the basis of such sales. These allocations were phantoms, and the shareholders were pseudo-purchasers. Thus, the true measure of the

so-called patronage dividend was not how much cement the paper patron consumed, but rather how much the taxpayer earned by selling to others.

The second revealing circumstance is the absence of horizontal similitude among the stockholder-patrons. In the usual manufacturing cooperative situation, the patrons have a fraternal commercial relationship with respect to the business of the cooperative and its products other than as investors. For example, in Fruit Growers' Supply Co. v. Commissioner of Internal Revenue, *supra,* the cooperative "manufactured lumber and shook for the manufacture of packing boxes for the marketing of the fruit" for its patrons. 56 F.2d at 91. The patrons were fruit growers who had formed the cooperative to facilitate the procurement of fruit packing boxes at a minimum cost, and they clearly had a fraternal commercial relationship. In the case of a cement manufacturing cooperative it would be logical to expect that its patrons would be contractors, builders, and others with related occupations. Here, however, the businesses and professions of the principal shareholders are diverse: accounting, law, automobiles, construction, engineering, public relations and textiles. It would be a travesty to regard this variegated and disparate conglomerate of shareholders as being cement oriented and connected. The only thing these shareholders had in common was an investment in what they hoped would be a money making venture, and in this respect their relationship to each other and to the corporation was no different from that of shareholders in any other publicly held corporation.

Notwithstanding the preceding, the taxpayer argues that this Court's opinion in United States v. Mississippi Chemical Co., 5 Cir. 1964, 326 F.2d 569, compels a

command of income and its benefits which marks the real owner of property."

Thus in the case at bar we must examine the record to determine the economic substance of the allocations of cement to

the stockholder-patrons. While the taxpayer's transactional documentation including registration statements is relevant, it is not a controlling indicant of economic reality.

holding that its distributions to its shareholders were "patronage dividends". We have carefully studied both the opinion of our Court and that of the lower court in that case, 197 F.Supp. 490, and we have found nothing in either opinion which deals with what constitutes a bona fide patronage dividend, the issue at bar. In fact the Court's opinion begins with the assumption that the distributions to shareholders were bona fide patronage dividends. The only issue raised in *Mississippi Chemical* was the manner in which patronage dividends were to be computed. That issue was summarized by Judge Hutcheson as follows:

"The basic contention of the appellant [the Commissioner], which was decided against it in the district court, is that the sole method of computation of the patronage dividends claimed in this case is that prescribed in the formulas laid down in Bureau rulings, decisions, and memorandums, and that no other method may be used."

Thus, we conclude that *Mississippi Chemical* is not controlling here.

The taxpayer attempted to clothe its shareholders as patrons and its corporate dividends as patronage payments. Like the district court, we find that the patronage vestments do not fit and therefore the taxpayer's distributions of net profits to its shareholders did not result from "business done with or for patrons." The generation of business is usually the result of positive action, but here the transactions atttributed to the paper patrons resulted from inaction. The taxpayer's shareholders never had any actual contact with their allocations of cement; they arranged the corporate apparatus to sell cement to the general public; and they had no commercial fraternal relationship other than as investors. In economic substance the taxpayer's distributions were the same as ordinary corporate dividends, and consequently they could not be excluded from the taxpayer's gross income.

The judgment of the district court is Affirmed.