MISSISSIPPI CHEMICAL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6556-82, 32440-83.[1]          Filed April 9, 1986.

*Arthur E. Bryan, Jr.,* and *Darrell McGowen,* for the petitioner.

*Thomas R. Ascher,* for the respondent.

KÖRNER, *Judge*: Respondent determined deficiencies in Federal income tax against petitioner as follows:

| Docket No. | TYE June 30— | Deficiency | Additions to tax sec. 6653(a)[2] |
|---|---|---|---|
| 6556-82 | 1976 | $4,042,534.95 | $202,126.75 |
| | 1977 | 4,351,882.91 | 217,594.15 |
| 32440-83 | 1978 | 383,128.30 | 0 |
| | 1979 | 330,120.68 | 0 |

After concessions by both parties, the issues remaining for decision are (1) Whether, for the taxable years ending

---

[1]The instant cases were consolidated by order of this Court dated Apr. 8, 1985.

[2]All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

June 30, 1976, through June 30, 1979, certain amounts paid by petitioner, a nonexempt cooperative, constituted patronage dividends deductible from its gross income pursuant to section 1382; (2) whether, for the taxable year ending June 30, 1976, a payment made by petitioner constituted a patronage dividend or a purchase price refund, and thus was deductible/excludable from petitioner's gross income; and (3) whether certain "dealer credits" granted by petitioner during the taxable years ending June 30, 1978, and June 30, 1979, were ordinary and necessary business expenses within the meaning of section 162.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

As of the dates of filing the petitions herein, petitioner's principal place of business was in Yazoo City, Yazoo County, Mississippi. Petitioner timely filed U.S. corporation income tax returns for the taxable years ending June 30, 1976, through June 30, 1979.

### *Background*

Petitioner was organized as a nonexempt supply cooperative in 1948 under the general corporate laws of Mississippi. During the years in issue, it was primarily engaged in the manufacturing and marketing of nitrogenous and other fertilizers, on a cooperative basis, for approximately 20,000 shareholders. The total sales of petitioner's fertilizer products during these years were as follows:

| TYE June 30— | Total sales |
|---|---|
| 1976 | $219,058,000 |
| 1977 | 236,465,000 |
| 1978 | 245,669,000 |
| 1979 | 262,138,000 |

Petitioner's primary purpose was to provide fertilizer products at cost to its shareholders. Its articles of incorporation[3] required that a majority of its business be trans-

---

[3]Unless otherwise stated, all references to petitioner's articles of incorporation and bylaws are to said documents as they existed during the years in issue.

acted with its shareholders. During the years in issue, petitioner sold less than 10 percent of its fertilizer to nonshareholders.

Patronage rights were granted, pursuant to petitioner's articles of incorporation and bylaws, to the holders of the various types of petitioner's common stock. The patronage rights guaranteed each shareholder the preferred right to purchase at least the amount of fertilizer which was allocated to his shares. The rights were issued to each shareholder in the same proportion that the number of shares owned by the shareholder bore to the number of shares of issued and outstanding common stock. For example, the bylaws provided that a share of nitrogen series I common stock gave the holder thereof the preferred right to purchase 15 units of nitrogen products. Similarly, a share of nitrogen series II common stock granted the preferred right to purchase 5 units of nitrogen products and a share of nitrogen series III common stock granted the preferred right to purchase 1 unit of nitrogen products. Petitioner's board of directors met annually, prior to the commencement of each of the years in issue, to determine the shareholder product allocation for the ensuing fiscal year pursuant to the above ratios.

The articles of incorporation and bylaws did not require that purchases be limited to a direct relationship to the stock owned. Thus, some shareholders purchased more and some shareholders purchased less fertilizer than their patronage rights provided. If there was excess fertilizer for a given year because demand was low, and some shareholders did not fully exercise their patronage rights, the excess was either sold to other shareholders or to nonshareholders.

In addition to patronage rights, each shareholder who purchased fertilizer products was entitled to receive patronage dividends. The amount of patronage dividends was determined, annually, as of the close of each fiscal year, and was defined in the articles of incorporation and bylaws as the excess of the aggregate selling price over the aggregate cost of the fertilizer products sold to the shareholders. During the years in issue, petitioner claimed deductions from its income for patronage dividends paid as follows: June 30, 1976 - $40,205,694; June 30, 1977 - $22,158,350;

June 30, 1978 - \$18,067,367; and June 30, 1979 - \$20,196,639.

With respect to each shareholder, the articles of incorporation and bylaws provided that the patronage dividends were to be paid based solely on the dollar value of the business done by the shareholder with petitioner, regardless of (1) the amount of stock owned by the shareholder, (2) the corresponding amount of patronage rights appurtenant to such stock, and (3) whether the shareholder was a shareholder of record at the end of the fiscal year in which the purchase was made. The articles of incorporation and bylaws further provided that the patronage dividends were to be paid pursuant to a resolution adopted by the board of directors prior to the beginning of the year in which petitioner received the amounts from which the patronage dividends were to be paid.

Assignment of the patronage rights pertaining to petitioner's stock was permitted pursuant to its bylaws, provided that the terms and the conditions of the assignment did not conflict with its articles of incorporation or said bylaws. The assignment was also subject to approval by the board of directors.

When an assignment of patronage rights took place, the assignee would then buy fertilizer products directly from petitioner, whether or not he was also a shareholder of petitioner. Patronage dividends on these purchases, however, were treated differently. The right to patronage dividends attached solely to petitioner's common stock, *not* to the patronage rights. In this regard, prior to June 10, 1977, petitioner's bylaws provided that patronage dividends could not be allocated or distributed to purchasers of fertilizer who were not shareholders at the time the purchases were made.[4] Thus, during this time period, if the assignee-purchaser was also a shareholder of petitioner at the time of his purchases, then he was entitled to receive patronage dividends from petitioner. However, if the assignee-purchaser was not a shareholder of petitioner at the time of his purchase, then he was not entitled to receive

---

[4] The bylaws were amended, effective June 10, 1977, to provide that petitioner "may agree, by contract or agreement entered into prior to the sale, to pay a nonshareholder-patron a patronage refund on any product sold to such nonshareholder-patron."

patronage dividends. In other words, by virtue of the assigned patronage rights, petitioner could sell fertilizer directly to nonshareholders, but it could not, prior to June 10, 1977, pay the nonshareholders any resulting patronage dividends.

## Southern Nitrogen Supply Corp.

Southern Nitrogen Supply Corp. (SNS) was organized as a corporation under the general laws of Mississippi on January 15, 1954. The corporate charter of SNS provided, inter alia, that its stated purpose was to buy, sell, deal in and distribute fertilizers, and related products. In addition, the charter provided that each share of common stock was entitled to receive dividends in a sum not to exceed 5 percent per annum, with the dividends to be noncumulative, and that each share was to be entitled to one vote.

At the time SNS was incorporated, all 49 of the individuals who purchased stock in SNS were also shareholders of petitioner. Two of the seven original incorporators of SNS were associated with petitioner; one, Owen Cooper, was an officer of petitioner, while the other, W.B. Dunwoody, was an employee. With the exception of Mr. Cooper, however, none of the other directors or officers of SNS were directors or officers of petitioner at or near the time of the formation of SNS.[5]

SNS had two full-time employees,[6] and it maintained its own office facilities, a bank account, its own payroll records, sales invoices, records of patronage rights assigned to it, cash receipts and disbursements journals, and a general ledger. It operated out of two leased offices and a leased record storage area in Yazoo City, Mississippi.

SNS purchased fertilizer directly from petitioner, in part pursuant to stock which it owned in petitioner,[7] and in part

[5]During the taxable years in issue, Mr. Cooper was a director but not an officer of petitioner and was neither an officer nor a director of SNS. Neither party has provided us with any evidence as to whether SNS and petitioner had any directors or officers in common during the years before us.

[6]During the years in issue, the two employee positions consisted of a general sales manager and a secretary. The general sales manager position was held by Mr. R.H. Fisackerly from 1967 until his death in September 1979. Prior to 1967, Mr. Fisackerly served as vice president of sales for petitioner. He also owned stock in petitioner, and assigned the patronage rights attendant to such stock to SNS through June 30, 1979.

[7]During the years in issue, SNS owned 1,118 shares of petitioner's common stock. Petitioner has never owned any of the stock of SNS.

with patronage rights assigned to it from other shareholders of petitioner.[8] SNS then resold the fertilizer to its customers without ever having to take physical possession of it. The fertilizer was shipped direct from petitioner's facilities to SNS's customers. SNS has never owned or leased any land, building, or fertilizer storage facilities.

During the taxable years in issue, SNS purchased the following amounts of fertilizer from petitioner through its own patronage rights, as well as through patronage rights assigned to it by other shareholders of petitioner, and, as a result of these purchases, received the following payments which were treated as patronage dividends by petitioner:

| TYE June 30— | Fertilizer purchases by SNS | Payments treated by petitioner as patronage dividends |
|---|---|---|
| 1976 | $1,060,895 | $307,492.07 |
| 1977 | 3,401,737 | 631,138.01 |
| 1978 | 3,056,682 | 482,680.74 |
| 1979 | 1,677,111 | 287,922.00 |

## The Assignments by SNS

During the taxable year ending June 30, 1976, SNS entered into three separate agreements whereby it assigned patronage rights which it held to a total of 28,000 tons of petitioner's nitrogen fertilizer production to Southern Farmers Association (SFA), MFC Services (MFC), and Pro Rico Industries (Pro Rico), in the amounts of 10,000 tons, 9,000 tons, and 9,000 tons, respectively.[9] The consideration paid for the assignments was $262,500 from SFA, $225,000 from MFC, and $337,500 from Pro Rico. SFA, MFC, and Pro Rico additionally agreed to assign to SNS any patronage dividends they might receive as a result of their purchases.

---

[8] The number of petitioner's shareholders who assigned their patronage rights to SNS during the years in issue was as follows:

| TYE June 30— | No. of shareholders assigning rights to SNS |
|---|---|
| 1976 | 465 |
| 1977 | 458 |
| 1978 | 436 |
| 1979 | 425 |

As previously found, petitioner had approximately 20,000 shareholders in the years in issue.

[9] The assignment agreements were substantially identical, with the exception of the amount of product allocation for, and the initial amount of cash paid by SFA, MFC, and Pro Rico.

Petitioner was not a party to the assignment agreements, but the agreements were presented to petitioner before any purchases were made using the assigned patronage rights.

During the taxable year ending June 30, 1976, SFA, MFC, and Pro Rico, pursuant to the patronage rights assigned to them by SNS, purchased nitrogen fertilizer directly from petitioner in the dollar amounts of $997,233, $1,117,240, and $1,115,977, respectively. Within 8 1/2 months after the close of the taxable year in which the SFA, MFC, and Pro Rico purchases occurred, petitioner made payments in the amounts of $323,823, $289,040, and $323,457 directly to SNS. These payments were a result of the respective purchases by SFA, MFC, and Pro Rico, were computed on a patronage basis, and were treated as patronage dividends by petitioner, but were paid directly to SNS at the direction of SFA, MFC, and Pro Rico, respectively. SFA and MFC were shareholders of petitioner throughout the taxable year ending June 30, 1976, and thus were shareholders at the time of their purchases. Pro Rico, however, was a shareholder of petitioner only until November 10, 1975, and was not a shareholder at the time its purchases were made.

## The Dealer Credits

Petitioner had approximately 1,200 shareholder-dealers during the years in issue, and granted each dealer a credit on the purchase price of fertilizer in the amount of $5 per ton purchased. The use of dealers is a common practice in the industry and over 50 percent of petitioner's fertilizer business was done through its dealers, resulting in approximately $9 million worth of dealer credits being granted for each of the years in issue.

The dealers were required by petitioner to purchase fertilizer in carload lots ranging from 18 to 80 tons. Annual purchases by the dealers varied depending on the size of the dealer. A dealer in a small rural area, for example, might purchase as little as 300 tons of petitioner's fertilizer products per year, while other dealers might purchase several thousand tons per year.

In order to qualify for the dealer credits, the dealers were required to perform certain services for petitioner. Though not all of petitioner's dealers provided the same services,

the more important services appeared to be that: first, the dealers were responsible for purchasing an acceptable volume of fertilizer, including taking possession of at least 40 percent of the product during the off-season,[10] in order to prevent petitioner from accumulating fertilizer in excess of its storage capacity, and second, the dealers were responsible for providing prompt payment for the fertilizer, thus providing a source of working capital for petitioner. Other services (provided by some dealers but not by others) included: maintaining an inventory of fertilizer products; maintaining a retail outlet; being open to the public for 5 days during the week; and being available to assist farmers in the area to perform tasks such as spreading fertilizer.

During each of the years in issue, SNS purchased approximately 30,000 tons of fertilizer from petitioner. Petitioner treated SNS as a dealer and accordingly "paid" SNS dealer fees, at the rate of $5 per ton, in the amount of $126,746.82 for the taxable year ending June 30, 1978, and $60,777.83 for the taxable year ending June 30, 1979, by crediting such amounts against the gross amounts due on the invoice for the fertilizer. SNS remitted to petitioner the gross invoice price less the dealer credit. Petitioner treated the gross invoice price as income and deducted the dealer credit as a business expense.

The following table provides a summary of the disallowances by respondent which are relevant to this case:

|  | Taxable year ending June 30— | | | |
|---|---|---|---|---|
|  | 1976 | 1977 | 1978 | 1979 |
| Patronage dividends disallowed: | | | | |
| On purchases by SNS | $307,492.07 | $631,138.01 | $482,680.74 | $287,922.50 |
| On purchases by SFA | 323,823.00 | | | |
| On purchases by MFC | 289,040.00 | | | |
| On purchases by Pro Rico | 323,457.00 | | | |
| Dealer credits disallowed | | | 126,746.82 | 60,777.83 |
| Total disallowances | 1,243,812.07 | 631,138.01 | 609,427.56 | 348,700.33 |

[10]The term "off-season" is defined as the 10-month period beginning in May and continuing through February.

## OPINION

## I.

The first issue for decision is whether, for the years before us, the amounts paid by petitioner to SNS, which resulted from the purchases of fertilizer by SNS, SFA, and MFC, were properly categorized as patronage dividends and thus deductible[11] from petitioners' gross income.

Resolution of this question requires us to examine the definition of "patronage dividend." The statutory definition of this term, located in section 1388(a), is as follows:

SEC. 1388(a). PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—[12]

(1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

Of particular importance to the disposition of this case is the language requiring that the distribution be made out of earnings from "business done with or for patrons." The parties do not dispute that petitioner has complied with the other provisions of section 1388(a); they disagree as to

---

[11]There is some confusion as to whether patronage dividends are treated as exclusions or deductions. The statute on its face appears to indicate that these dividends are treated as deductions. Sec. 1382(b). In *Mississippi Valley Portland Cement Co. v. United States*, 408 F.2d 827, 831 n. 6 (5th Cir. 1969), cert. denied 395 U.S. 944 (1969) (*MVP Cement*), however, the Fifth Circuit stated "The intent to treat these payments as exclusions could not be clearer if Congress had used the word 'exclusion'." Accord *Des Moines County Farm Service Co. v. United States*, 324 F. Supp. 1216, 1217 and n. 2, 1219 (S.D. Iowa), affd. per curiam 448 F.2d 776 (8th Cir. 1971). Cf. *Stevenson Co-Ply, Inc. v. Commissioner*, 76 T.C. 637, 644 and n. 9 (1981). We do not find it necessary to resolve this question here, as our result is consistent with the use of either term. For purposes of convenience only, we will use the term "deduction."

[12]The parties have stipulated, and we hold, that petitioner was a cooperative within the meaning of sec. 1381(a) and satisfied the consent provisions of sec. 1388(c).

whether the payments to SNS resulted from business done with or for a patron.

Section 1388 does not explicitly define the term "patron." Looking to the regulations, however, we find that:

The term "patron" includes any person with whom or for whom the cooperative association does business on a cooperative basis, whether a member or a nonmember of the cooperative association, and whether an individual, a trust, estate, partnership, company, corporation, or cooperative association. [Sec. 1.1388-1(e), Income Tax Regs.]

During the years in issue, SNS was a corporation and, as such, qualified as a "person." SNS was also a person "with whom" petitioner did business, in that SNS purchased fertilizer products from petitioner and petitioner delivered the products by shipping them to destinations designated by SNS. The business was done with SNS on a "cooperative basis" in that SNS was a stockholder of petitioner and thus was contractually entitled, pursuant to petitioner's articles of incorporation and bylaws, to receive patronage dividends based on the value of its business done with petitioner. It is clear that the patronage dividends paid to SNS on its purchases did result from business done with or for a patron. It is also clear that the patronage dividends on the purchases by SFA and MFC were a result of business done with or for patrons for the same reasons we have articulated with respect to SNS.

Our result is not affected by the assignment agreements existing between SNS and SFA, and SNS and MFC. In *Land O'Lakes, Inc. v. United States*, 675 F.2d 988, 989-990 (8th Cir. 1982) the Eighth Circuit indicated that patronage dividends were deductible at the cooperative level, despite the fact that the right to receive these dividends was, in effect, assigned by patrons of the cooperative to nonpatrons. Here, an even stronger case exists for recognizing the assignments because the parties to the assignment agreements were all shareholder-patrons. Petitioner's bylaws, moreover, specifically provided that the patronage rights were assignable. Assignment of the resulting patronage dividends was also allowed, provided, as was true at least with respect to SNS, SFA, and MFC, that the patronage dividends were not allocated by petitioner to persons who were not shareholders at the time the purchases were made.

Thus, in our opinion, the assignment agreements do not affect the deductibility of the patronage dividends by petitioner. If A owes money to B, and the latter directs that the money be paid to C in discharge of B's debt to C, it is a payment to or for the benefit of B, and is still B's income in the first instance. See *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729-730 (1929); *Huff v. Commissioner*, 80 T.C. 804, 814-815 (1983). We note further, that petitioner was not a party to the agreements between SNS and SFA and MFC, respectively, but simply honored the requests of the latter as to payment.

Petitioner thus argues that SNS, SFA, and MFC were patrons with whom petitioner did business during the years in issue. Respondent disagrees with petitioner and directs us to a case where he believes a court was faced with a similar problem, *Mississippi Valley Portland Cement Co. v. United States*, 408 F.2d 827 (5th Cir. 1969), cert. denied 395 U.S. 944 (1969) (*MVP Cement*).

Respondent's reliance on *MVP Cement* is misplaced. In *MVP Cement*, virtually all of the patronage rights to buy the taxpayer-cooperative's cement were assigned to Valley Sales, as sales agent for the cooperative and for its shareholders. As a result of this arrangement, all of the cement produced by the cooperative was delivered to Valley Sales to be sold to the general public. At the conclusion of each tax year, the net receipts from sales of cement over and above production costs were then allocated and distributed to the cooperative's shareholders of record, in proportion to each person's stock ownership as of the year's end. On these facts, the Fifth Circuit held that the cooperative's profits were not from business done with or for its shareholders, and therefore the payment of its margins to its shareholders were not excludable from its income as patronage dividends.

*MVP Cement* is not dispositive of the facts here primarily for two reasons. First, in *MVP Cement*, the Fifth Circuit was clearly faced with a situation where the cooperative's product (i.e. the cement) went one way, and the so-called patronage dividends went another. There, almost all of the cement was delivered to Valley Sales and then sold to the general public, yet the alleged patronage dividends were

paid directly to the cooperative's shareholders, in proportion to each person's stock ownership at the end of the year. Valley Sales, acting as sales agent, could not be considered the true patron of the cooperative, nor could the cooperative's shareholders, who bought no product. The true purchasers of the product, and thus the true patrons, were the purchasers who bought from the taxpayer through Valley Sales as agent, yet those patrons received no patronage dividend.

Here, however, the product was bought by SFA, MFC, and SNS (even though later perhaps resold by them), and the resulting patronage dividends were required to be paid to these same shareholder-patrons, and they were. As we previously indicated, the fact that SFA and MFC assigned their patronage dividends to SNS is wholly irrelevant. More importantly, the dividends were not paid in proportion to SNS, SFA, and MFC's stock ownership in petitioner, as was the case in *MVP Cement*, but instead were paid based on the dollar value of the purchases by them. Thus, unlike the pseudo-cooperative in *MVP Cement*, petitioner here was clearly in compliance with the provisions of sections 1388(a) and 1382(b).

Second, in *MVP Cement*, the arrangement between the taxpayer-cooperative and Valley Sales was one of principal-agent. Here, on the other hand, SNS, SFA, and MFC were each independent entities, purchasing from petitioner for their own accounts. They were true patrons. It follows that, because SNS, SFA, and MFC acquired title to the product, unlike Valley Sales, they could make various contractual arrangements between themselves without the assent of petitioner, including the terms upon which they bought and sold preferred patronage rights.[13]

As we have stated, the patronage dividends paid by petitioner were a result of, and in proportion to, the value of

[13]There are other differences between the two cases. For example, in *MVP Cement*, the purported patronage dividends were paid to shareholders of record at the end of the year; thus, if a shareholder disposed of his stock prior to yearend, he would not receive a refund. Here, however, the patronage dividends were paid to shareholders who (1) purchased fertilizer during the year, and (2) who made said purchases *while they were shareholders*; regardless of whether they still held stock at the end of the year. Also, in *MVP Cement*, the cooperative discouraged its shareholders from purchasing the cement, preferring instead to deliver the product to its sales agent. By contrast, in the instant matter, the parties have stipulated that petitioner never discouraged its shareholders from purchasing fertilizer.

the purchases made by SNS, SFA, and MFC. They were also paid in full compliance with the provisions of sections 1388(a) and 1382(b). This is where our inquiry should and does end. We cannot agree with respondent that, as a result of the various assignment agreements, *MVP Cement* somehow controls the facts here. Petitioner was never a party to these agreements, and to yield to respondent's argument would place an extreme hardship on petitioner. By holding for respondent, we would, in effect, be requiring petitioner not only to comply with the statutory requirements of subchapter T, but also to control the activities of its shareholder-patrons. The law does not require this.

We accordingly hold that the payments by petitioner to SNS, SFA, and MFC were properly classified as patronage dividends, and as such, were deductible from petitioner's gross income under section 1382(b).

## II.

The second issue for decision is whether, for the taxable year ending June 30, 1976, the amount paid by petitioner to SNS, as a result of the purchase of fertilizer by Pro Rico, was deductible or excludable from petitioner's gross income.

The facts regarding petitioner's sales to Pro Rico are the same as the facts regarding petitioner's sales to SFA and MFC, with one vital difference: Pro Rico was not a shareholder of petitioner at the time the fertilizer was purchased.

Petitioner's articles of incorporation did not address the payment of patronage dividends to nonshareholders at the time of said purchase, but its bylaws provided that "The excess of the selling price over the cost of products sold to nonshareholders shall not be allocated to such nonshareholder-patrons." Thus, as petitioner admits on brief, because Pro Rico was not a shareholder at the time of its purchase, and because neither petitioner's bylaws nor its articles of incorporation created a preexisting obligation between petitioner and Pro Rico, the payment by petitioner of "patronage" resulting from said purchase was not deductible from gross income under the provisions of

section 1382(b). See sec. 1388(a)(2); sec. l.1388-l(a)(1), Income Tax Regs.[14]

Petitioner nevertheless maintains that the payment to Pro Rico qualifies for exclusion as a refund of the purchase price of the fertilizer. As authority for this proposition, petitioner cites *Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476 (1980); *Haas Bros., Inc. v. Commissioner*, 73 T.C. 1217 (1980); *Max Sobel Wholesale Liquors v. Commissioner*, 69 T.C. 477 (1977), affd. 630 F.2d 670 (9th Cir. 1980); and *Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956).

In each of the aforementioned cases, the Court indicated that a purchase price refund was excludable from the taxpayer-vendor's gross income. A common thread runs through each of these cases, viz, in each case there was an agreement between the taxpayer and its customers, entered into prior to the sale of the product, providing for the refund of some part of the purchase price.[15] In this case, the common thread does not appear.

In its search for a purchase price refund agreement, petitioner points to the assignment agreement between Pro Rico and SNS. Petitioner argues that this agreement, which was presented to petitioner prior to the purchase of fertilizer by Pro Rico, shows that there was a purchase price refund agreement between petitioner and Pro Rico.

The assignment agreement in question provides, inter alia, that "All patronage refunds will accrue to Southern Nitrogen Supply Company." This language, contends petitioner, indicates that a refund of the purchase price equal in amount to a patronage dividend was anticipated by Pro Rico, and that petitioner accepted Pro Rico's order and purchase price knowing this to be the case.

The burden of proving the existence of the purchase price refund agreement is on petitioner. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a). We do not believe that

---

[14]Sec. 1.1388-1(a)(1), Income Tax Regs., requires the preexisting obligation to be evidenced by either the articles of or bylaws of the cooperative, a requirement under State law, or by a written contract.

As we have indicated in the text, neither petitioner's articles of incorporation nor its bylaws fulfilled this requirement. Nor is it clear that State law created such an obligation, particularly where, as here, petitioner's bylaws precluded such an arrangement. Cf. Miss. Code Ann. sec. 79-17-25(1985). Since the parties have not presented us with any evidence of a written contract, we must conclude that there was no preexisting obligation between petitioner and Pro Rico within the meaning of sec. 1388(a).

[15]See also *Eaton v. Commissioner*, T.C. Memo. 1979-320.

this burden has been met. The *only* evidence petitioner has introduced is that of the assignment agreement between Pro Rico and SNS. Petitioner was not a party to the assignment agreement, and thus it cannot be held that this defined petitioner's obligations with respect to Pro Rico. If anything, the agreement suggests that the payment to SNS, at the direction of Pro Rico, was treated by petitioner as a patronage dividend.[16] Accordingly, we conclude that the payment in issue was not deductible or excludable from petitioner's gross income, either as a patronage dividend or as a price rebate.

## III.

The third issue for decision is whether the dealer credits granted by petitioner to SNS during the taxable years ending June 30, 1978, and June 30, 1979, were ordinary and necessary business expenses within the meaning of section 162.

Section 162 allows a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Whether expenditures are directly related to a business and whether they are ordinary and necessary are usually questions of fact. *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943); *Henry v. Commissioner*, 36 T.C. 879, 883 (1961). For business expenditures to be "ordinary," the payments must be normal, usual, and customary in size and character; they must arise from transactions which were of a common or frequent occurrence in the type of business involved. *Lilly v. Commissioner*, 343 U.S. 90, 93 (1952). For the expenditures to be "necessary," within this context, they must be appropriate and helpful. *Commissioner v. Heininger, supra* at 471. The taxpayer is ordinarily the best judge as to whether the expenditures were "necessary." *Henry v. Commissioner, supra* at 884.

With these well-established principles in mind we turn to the facts before us. Petitioner argues, and we agree, that the primary functions of a dealer for petitioner, which would

---

[16]In fact, petitioner deducted it as such in its return, as the parties have stipulated, although, as we have held, petitioner was not obligated to pay any patronage refund to Pro Rico.

justify some price concession, were twofold: first, the dealer would be responsible for taking delivery of a substantial amount (i.e., at least 40 percent of its total acquisitions) of fertilizer during the off-season,[17] and second, the dealer would be responsible for prompt payment for the fertilizer. The former is important because, otherwise, petitioner would have to pay the high costs of storing the huge amounts of fertilizer it produced during the off-season, and the latter is an important source of working capital to enable petitioner to operate during this time period. It is these benefits to petitioner which justify the granting of a price concession of $5 per ton as a dealer credit or an "agent fee" and which makes such a concession an ordinary and necessary expense within the meaning of section 162.

The parties do not dispute that SNS purchased approximately 30,000 tons of fertilizer during each of the years in issue. For SNS to comply with the above-stated dealer requirements during the off-season, however, it would have had to acquire, and provide payment for, at least 40 percent of 30,000, or 12,000 tons of fertilizer.

Petitioner relies on the testimony of its president, Thomas C. Parry, and certain invoices introduced in evidence, in order to show that it did meet these requirements.

Mr. Parry testified to the effect that SNS took approximately 50 percent of its fertilizer during the off-season.[18] We find this brief and very general testimony to be unconvincing, particularly where, as here, the time, the

---

[17]As was stated in our findings, the "off-season" consists of the 10 months other than March and April.

[18]Mr. Parry testified as follows:

Q. What are some of these [dealer] qualifications?

A. Well, qualifications are—basically, they're simple. The whole idea of a dealer approach is that, you know, really they save us money because they do functions more inexpensive than we could do. A dealer is responsible for payment of the fertilizer and an extremely important thing, the dealer is responsible for taking a substantial amount of products off-season.

We want our clients 12 months a year, the actual use period for the farm is a very short period of time and it's rather obvious we couldn't deliver all the material in that time. As a rule of thumb, we usually say a dealer needs to take at least 40 percent of his product during the off-season in order to be able to take 60 percent during the on-season.

I might add, you know, Southern Nitrogen did a very good job in that area. They probably took 50 percent off-season and sometimes a little bit more than that. * * *

  *  *  *  .*  *  *  *

Basically, as far as the real reason is concerned for dealers, all they receive is the $5 discount because number one, they buy or store off-season and number two, they are financially responsible and can pay for the fertilizer.

amount, and the billing of SNS's purchases could have been precisely proved through petitioner's sales invoices to SNS. See *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982).

The sales invoices produced, however, are also unconvincing. Petitioner has provided us with only 13 invoices on which dealer credits were granted and only 4 of these invoices were actually billed to SNS. The pertinent facts of these 4 invoices may be summarized as follows:

| Invoice date | Quantity purchased (in tons) | Amount of dealer credits |
|---|---|---|
| 1. June 12, 1978 | 23.10 | $115.50 |
| 2. June 30, 1978 | 484.90 | 2,424.50 |
| Totals for TYE June 30, 1978 | 508.00 | 2,540.00 |
| 3. Nov. 6, 1978 | 4,251.96 | 21,259.80 |
| 4. June 11, 1979 | 21.26 | 106.30 |
| Totals for TYE June 30, 1979 | 4,273.22 | 21,336.10 |

As the above table indicates, petitioner has fallen well short of showing that SNS made the required purchases of 12,000 tons of fertilizer, and paid for them, for each of the years in issue in the off-season. The "ordinary and necessary" element of the claimed deduction has therefore not been shown. Because petitioner has failed to meet its burden of proof on this issue, *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a), respondent's disallowance of the claimed deductions must be sustained.

To reflect the foregoing, as well as concessions made by both parties,

*Decisions will be entered under Rule 155.*